# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

UnitedHealthcare of Pennsylvania, :
Inc., Aetna Better Health Inc., :
UPMC for You, Inc., Geisinger :
Health Plan, AmeriHealth Caritas :
of Pennsylvania, AmeriHealth :
Caritas Northeast, and Keystone :
First, :
                    Petitioners :
                         :
          v. : No. 1357 C.D. 2016
                         :
Bruce Baron, :
                  Respondent :

Gateway Health Plan, Inc., :
                  Petitioner :
                         :
          v. : No. 1358 C.D. 2016
                         :
Bruce G. Baron, Esq., :
                  Respondent :

Bruce G. Baron, :
                  Petitioner :
                         :
          v. : No. 1427 C.D. 2016
                         : Argued: June 7, 2017
Department of Human Services; :
United Healthcare of Pa., Inc.; :
Aetna Better Health Inc.; UPMC :
for You, Inc.; Geisinger Health Plan; :
AmeriHealth Caritas of Pa.; :
AmeriHealth Caritas Northeast; :
Keystone First; Gateway Health Plan, :
Inc.; and Health Partners Plan, Inc., :
                  Respondents :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JOSEPH M. COSGROVE, Judge

**OPINION**
**BY JUDGE SIMPSON**                    **FILED: October 5, 2017**

Before us are consolidated appeals from a final determination of the Office of Open Records (OOR) directing disclosure of nursing home provider rates pursuant to the Right-to-Know Law (RTKL).[1] Specifically, Bruce Baron (Requester) asked the Department of Human Services (DHS) to disclose rates paid to providers by managed care organizations (MCOs)[2] participating in the Medical Assistance (MA) program, HealthChoices. DHS denied access, advising it neither receives nor reviews the rates. On the MCOs' behalf, DHS raised Section 708(b)(11) of the RTKL, 65 P.S. §67.708(b)(11) (protecting proprietary and trade secret information). Before OOR, the MCOs also claimed the rates were exempt under the Uniform Trade Secrets Act, 12 Pa. C.S. §§5301-5308 (Trade Secrets Act). Based on its reading of Department of Public Welfare v. Eiseman, 125 A.3d 19 (Pa. 2015), OOR determined the rates were financial records. Both DHS and the MCOs challenge OOR's conclusion. Requester challenges OOR's proceedings and its rationale.

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101–67.3104.

[2] The MCOs are UnitedHealthcare of Pennsylvania, Inc., Aetna Better Health, Inc., UPMC for You, Inc., Geisinger Health Plan, AmeriHealth Caritas of Pennsylvania, AmeriHealth Caritas Northeast, Keystone First, Gateway Health Plan, Inc., and Health Partners Plans, Inc.

In our appellate capacity, we conclude OOR erred as a matter of law in determining Eiseman governed disclosure of the rates. Further, OOR conflated constructive possession with access to third-party contractor records under Section 506(d)(1) of the RTKL, 65 P.S. §67.506(d)(1). Therefore, we reverse OOR's final determination. Moreover, because OOR did not analyze the direct relationship of the rates to the governmental function the MCOs provide, we remand to OOR so it may analyze Section 506(d)(1) of the RTKL, and any exemptions the MCOs asserted to disclosure, on the current record, with the addition of the MCOs' HealthChoices contracts.

## I. Background

## A. Facts

UnitedHealthcare of Pennsylvania, Inc., Aetna Better Health, Inc., UPMC for You, Inc., Geisinger Health Plan, AmeriHealth Caritas of Pennsylvania, AmeriHealth Caritas Northeast, and Keystone First (collectively, Health Plans), Gateway Health Plan, Inc. (Gateway), and Health Partners Plans, Inc. (Health Partners), are the MCOs[3] that contract with DHS to provide nursing home services for HealthChoices enrollees.

In turn, the MCOs contract with nursing home providers, paying them privately negotiated rates in exchange for providing services to enrollees. MCOs pay different rates to different nursing home providers. MCOs maintain confidentiality of

---

[3] DHS regulations define MCO as: "an entity under contract with [DHS] that manages the purchase and provision of health services, including nursing facility services, for MA recipients who are enrolled as members in the entity's health service plan." 55 Pa. Code §1187.2.

2

the rates paid to providers by agreement and through other means. Reproduced Record (R.R.) at 387a-89a, 394a-96a, 402a-03a, 410a-12a, 417a-19a.

The contracts between DHS and the MCOs do not contain the rates paid to nursing home providers, and DHS does not receive or review the rates attendant to its oversight of HealthChoices. Rather, DHS accepts template contracts to assess compliance with delivery of services required under the program. Pursuant to their contracts with DHS, the MCOs must pay for the first 30 days of an enrollee's stay in a nursing home. R.R. at 385a.

After 30 days, the MCOs are no longer liable for payment through HealthChoices, as such payment to nursing homes is covered through the MA fee-for-service program. DHS receives cost reports from nursing home providers attendant to its oversight of the MA fee-for-service program.

## B. Procedural History

Requester submitted a request to DHS, seeking "copies of documents that <u>disclose rates paid</u> during 2014-2016 by [MCOs] <u>to nursing homes</u> for nursing home care of MA recipients <u>during the period when the [MCO] is liable for payment of such costs</u> [(Requested Rates)]." R.R. at 20a (emphasis added) (Request). He claimed <u>Eiseman</u> required disclosure. <u>Id.</u> In correspondence with DHS, he explained he sought "only that [information] <u>in the hands of the MCO</u> contracting with DHS." R.R. at 8a (emphasis added).

3

After invoking an extension and notifying the MCOs, DHS denied the Request. R.R. at 3a-5a. DHS advised it did not possess the rates, so it would need to retrieve them from the MCOs. DHS based its denial on the MCOs' objections to disclosure under Section 708(b)(11) of the RTKL, 65 P.S. §67.708(b)(11), and the differences between the Requested Rates and the rates in Eiseman.

Requester appealed to OOR. The Health Plans, Gateway and Health Partners filed statements of direct interest pursuant to Section 1101(c) of the RTKL, 65 P.S. §67.1101(c), which OOR accepted, recognizing their participation.

OOR invited the parties and participants to develop an evidentiary record. Although requested to hold a hearing, OOR declined.

DHS submitted a position statement, explaining the rates are not in its physical possession, but rather in the possession of its contractors, the MCOs. Further, DHS clarified it did not see, review, approve, or control the rates paid by MCOs to nursing home providers. In support, DHS submitted three sworn affidavits from: Michael Penney, Audit Manager for Division of Rate Setting and Auditing in DHS' Office of Long-Term Living (Penney Affidavit); Allen Fisher, Acting Director of the Bureau of Fiscal Management in Office of MA (Fisher Affidavit); and, Laurie Rock, Director of the Bureau of Managed Care Operations in the Office of MA (Rock Affidavit).

The MCOs argued the Requested Rates were privately negotiated with the nursing home providers, constituting confidential proprietary information

4

protected under Section 708(b)(11) of the RTKL, 65 P.S. §67.708(b)(11). They also claimed the Trade Secrets Act exempted their disclosure. In support, the MCOs submitted several affidavits. In their position statements, the MCOs asserted Eiseman was factually and legally distinguishable and did not apply here.

Based on the timely submissions,[4] OOR granted Requester's appeal. Baron v. Dep't of Human Svcs., OOR Dkt. No. AP 2016-1038 (July 13, 2016) (Final Determination). Although recognizing DHS lacked actual possession, OOR determined DHS had constructive possession of the Requested Rates through its contracts with the MCOs under Section 506(d) of the RTKL. Citing Eiseman, OOR concluded the Requested Rates are financial records "dealing with disbursements of public money and services acquisitions." Id. at 8. OOR rejected the contention that Eiseman was premised upon DHS' approval of the rates. In support, OOR cited an unpublished, single-judge opinion rendered in contempt proceedings after remand in Eiseman. Dep't of Pub. Welfare v. Eiseman (Pa. Cmwlth., Nos. 1935, 1949 & 1950 C.D. 2012, filed June 28, 2016) (single j. op.) (Contempt Opinion).

OOR also rejected the MCOs' argument that the rates are protected by Section 708(b)(11) of the RTKL or the Trade Secrets Act. Again, relying upon Eiseman, OOR noted neither the Trade Secrets Act nor Section 708(b)(11) protected financial records.

Health Plans timely petitioned for review of the Final Determination to this Court (No. 1357 C.D. 2016). After intervening in Health Plans' action, Gateway

---

[4] OOR did not consider Requester's rebuttal to the MCOs submitted after the record closed.

5

also petitioned for review (No. 1358 C.D. 2016). Thereafter, Requester filed a timely cross-petition for review, in which he named OOR as a respondent as well as DHS and the MCOs (No. 1427 C.D. 2016), which he subsequently amended.[5] This Court then consolidated the appeals and cross-appeals on its own motion.

Neither Health Partners nor DHS appealed the Final Determination. However, Health Partners filed a Notice of Intervention, to which Requester filed an application to quash. Following briefing of the merits and oral argument, these matters are now ready for disposition.

## II. Contentions
### A. MCOs

First, the MCOs argue that OOR erred in relying on Eiseman, which involved payments of government funds to dental subcontractors. Significantly, the Supreme Court presumed DHS possessed the rates at issue. In contrast, here DHS does not possess the MCO rates and does not require their submission for approval or otherwise. Instead, the MCOs submit only a template contract that contains no rate information to DHS. DHS performs a compliance check of the template contract to ensure it includes appropriate language and contract provisions for the HealthChoices program.

Second, the MCOs assert the requested rates are not "records" under the definition contained in Section 102 of the RTKL, 65 P.S. §67.102. The MCOs maintain the rates the MCOs pay to nursing home providers, which are negotiated

_____

[5] Requester also filed a petition for review against DHS and Health Partners, docketed at No. 503 M.D. 2016, seeking to enforce the Final Determination in our original jurisdiction.

6

without agency involvement, do not document a "transaction or activity" of DHS. Rather, the rates are part of an independent transaction between the MCOs and their nursing home providers, none of which is a Commonwealth agency. Even if the negotiated rates the MCOs paid to nursing home providers documented a "transaction or activity" of DHS, the Requested Rates are not "created, received or retained" by DHS. Further, the MCOs do not submit the Requested Rates to DHS for any purpose.

Third, the MCOs contend OOR erred in finding that the Requested Rates were in DHS' constructive possession. The MCOs explain that they contract with DHS to administer the HealthChoices program, but their contracts with individual nursing home providers are not "on behalf of" DHS, as required by Section 506(d)(1) of the RTKL, 65 P.S. §67.506(d)(1). Contracts executed between the MCOs and nursing home providers are not submitted to DHS. Further, the cost of obtaining nursing home providers' services does not directly relate to the performance of the contracted governmental function, so the Requested Rates do not meet the requirements for access under Section 506(d)(1) of the RTKL.

Fourth, the MCOs maintain that assuming for argument sake that the Requested Rates are "records" of DHS, OOR erred in holding they are "financial records" of the Commonwealth. The rates paid by the MCOs are not disbursements of DHS funds; rather, they are disbursements of the MCOs' funds.

## B. DHS

DHS argues its affidavits establish that it does not possess or control the Requested Rates. The affidavits establish: the MCOs do not submit the rates to

7

DHS; the nursing homes do not report the rates to DHS; DHS does not participate in the rate negotiations; and, DHS does not use the rates to pay nursing homes in its fee-for-service system.[6] DHS' ability to inspect or audit nursing homes, which are third parties, does not establish DHS possesses or controls the Requested Rates.

DHS also asserts it does not constructively possess the rates. Each nursing home signs an agreement enrolling as a provider in HealthChoices as a prerequisite to receiving payment for services rendered under the program. Providers (with which DHS contracts) are not obligated to enroll in HealthChoices. Further, DHS does not have authority to require a nursing home provider enrolled in HealthChoices to join an MCO's network, or to require that the nursing home accept a certain MCO's rates. The absence of any contractual or statutory control over the relationship between nursing homes and the MCOs defeats Requester's contention that DHS constructively possesses the rates.

**C. Requester**

In rebuttal, Requester argues that Health Plans (with the exception of Geisinger and UPMC for You) and DHS are collaterally estopped from pursuing defenses raised in Eiseman because they were parties who had a full and fair opportunity to litigate these issues. In addition, Requester claims OOR did not consider all of his alternate grounds for relief, including allowing him to supplement the record in response to evidence submitted by the MCOs and DHS.

---

[6] Requester challenges this assertion, arguing that DHS regulations governing its payments to providers incorporate the MCO-paid rates into a component of an MA day of care. 55 Pa. Code §1187.2 (definition includes when MCO pays 100% of the negotiated rate for a resident's care).

8

Requester also asserts the nursing home rates are "financial records" under the RTKL, such that the MCOs' claimed exemptions fail. He maintains DHS' separate provider agreements with nursing homes bring provider rates within the reach of Section 506(d)(1) of the RTKL. He emphasizes neither DHS nor the MCOs presented evidence that DHS did not control such rate information. Further, he contends the Requested Rates relate to DHS' payments to providers under its fee-for-service program, and so qualify as financial records.

In his cross-petition, Requester argues OOR violated his due process rights by not affording him an opportunity to respond to the MCOs' submissions. He also asserts OOR and DHS violated the due process rights of nursing home providers by not providing notice and an opportunity to participate.

## III. Discussion

At the outset, we confirm that our jurisdiction over these appeals is statutory. See Section 1301 of the RTKL, 65 P.S. §67.1301; Bowling v. Office of Open Records, 75 A.3d 453 (Pa. 2013). The appeals challenge the Final Determination and OOR's process. As a Chapter 13 court, we may undertake either *de novo* review and develop the record as a fact-finder, or rely on the record created by the appeals officer below. Dep't of Labor & Indus. v. Heltzel, 90 A.3d 823 (Pa. Cmwlth. 2014) (en banc).

### A. Procedure
#### 1. Intervention

Before reaching the merits, we consider Requester's application to quash Health Partners' Notice of Intervention (Notice). Requester argues Health Partners may not preserve its rights to challenge the Final Determination by filing a notice to intervene. He contends that, as a direct interest participant in the proceedings before OOR, Health Partners had 30 days to appeal. It did not do so. Under Pa. R.A.P. 1512(a)(2), Health Partners had 14 days to file a cross-petition for review after Health Plans filed the first petition for review. It did not do so. Consequently, Health Partners' Notice is untimely.

Health Partners filed its Notice pursuant to Pa. R.A.P. 1531(a) on September 8, 2016. In its entirety, the Notice stated: "Notice is hereby given that [Health Partners], a party below, hereby intervenes in this matter." See Notice. Four months later, Requester filed an application for relief seeking to quash Health Partners' intervention.

Rule 1531(a) pertains to "[a] <u>party</u> to a proceeding before a government unit." Pa. R.A.P. 1531(a) (emphasis added). Such parties may intervene as of right by filing a notice in the form of the Rule. <u>Id.</u> A non-party may seek leave to intervene. <u>See</u> <u>In re PP&L</u>, 838 A.2d 1 (Pa. Cmwlth. 2003).

A direct interest participant, as a non-party, has no right to intervene under Rule 1531. <u>Dep't of Educ. v. Bagwell</u>, 131 A.3d 638, 647 n.8 (Pa. Cmwlth. 2016) (<u>Bagwell 2016</u>). Because they are not parties who have a statutory right to appeal a final determination, we allow direct interest participants seeking to protect confidential proprietary or trade secret information to file petitions for review under

10

due process auspices.  W. Chester Univ. v. Schackner (Bravo), 124 A.3d 382 (Pa. Cmwlth. 2015); Dep't of Corr. v. Maulsby, 121 A.3d 585 (Pa. Cmwlth. 2015).

A notice of intervention is not the proper mechanism to challenge a final determination.  Bagwell 2016.  Aside from its technical impropriety when filed by a non-party, a form notice does not put any of the parties on notice as to the substantive claims or arguments that will be raised in the litigation.

Notably, Requester did not challenge the other notices of intervention filed by Gateway and Health Plans, presumably because they filed timely petitions for review preserving their challenges to disclosure.  Here, the Notice contained no information regarding Health Partners' interest in the litigation, in stark contrast to a petition for review.  Shortly after Health Partners filed a brief outlining its legal position, Requester moved to quash its intervention.  Thus, we are unpersuaded by Health Partners' arguments based on Requester's delay in challenging intervention.

It is clear from its briefs that Health Partners seeks intervention to challenge the Final Determination here.  Courts disapprove of filing notices to intervene in lieu of a petition for review, and the practice of intervening as a party petitioner is not permitted.  See G. DARLINGTON, ET AL., PA. APPELLATE PRACTICE, §1531:3 (2011-12 ed. 2011).  Because Health Partners seeks intervention in lieu of filing a petition for review, which would have been untimely,[7] we grant Requester's application to quash Health Partners' Notice.

---

[7] Health Partners did not seek leave to file a petition for review out of time.

11

## 2. Challenges to OOR Proceedings

Next, we address Requester's due process challenges. He contends OOR denied him due process when it did not accept his submissions after the record closed. He claims due process affords him the right to refute the MCOs' submissions. In addition, he asserts OOR violated the due process rights of nursing home providers because it did not require DHS to provide notice to them when they also possess the Requested Rates. He argues OOR's failure to ensure providers had an opportunity to participate in its proceedings violates due process.

### a. Requester's Response to MCOs

Appeals officers may limit a requester's opportunity to present evidence when developing the evidentiary record. Dep't of Educ. v. Bagwell, 114 A.3d 1113 (Pa. Cmwlth. 2015) (Bagwell 2015). "[N]either the RTKL nor the courts have extended rights to discovery … to a requesting party under the RTKL." State Emps.' Ret. Sys. v. Pennsylvanians for Union Reform (SERS v. PFUR), 113 A.3d 9, 20 (Pa. Cmwlth. 2015), vacated on other grounds, __ A.3d __, (Pa., 344 MAL 2015, January 17, 2017) (citing Sherry v. Radnor Twp. Sch. Dist., 20 A.3d 515 (Pa. Cmwlth. 2011)).

Generally, a requester's due process rights are not violated when OOR does not allow a requester to challenge or respond to submissions of direct interest participants. See SERS v. PFUR. This Court recognized an exception to this general rule when the requester bears the burden of proof, as with proving waiver of the attorney-client privilege. Bagwell 2015 (remanding to OOR to enable requester, who bore burden of proof, to develop record as to waiver of privilege).

Requester is not entitled to rebuttal for the sake of having the last word. Unlike the requester in Bagwell, he articulates no matter on which he bears the burden of proof on a discrete legal issue before this Court. Id. Thus, we discern no violation of due process when OOR did not consider his responsive submission.

We further discern no deficiency in OOR maintaining deadlines for party and participant submissions. OOR needs discretion in closing the record, particularly given the short statutory deadlines for issuing a final determination. Section 1101(b)(1) of the RTKL, 65 P.S. §67.1101(b)(1) (final determination must be mailed within 30 days unless requester agrees otherwise); see Bowling v. OOR, 75 A.3d 453, 467 (Pa. 2013) (recognizing "RTKL grants appeals officers wide discretion with respect to procedure" thereunder). Notably, Requester refused to extend the deadline for the Final Determination, which OOR issued within 30 days. Thus, it was appropriate for OOR to accept evidence from the MCOs without extending the deadline for Requester's submissions.

The process due in this statutory scheme is notice and an opportunity to present evidence to the fact-finder. Wishnefsky v. Dep't of Corr., 144 A.3d 290 (Pa. Cmwlth. 2016). A requester has no right to cross-examine those who may oppose access to the requested records. Sherry. Further, it is well-established that OOR is not required to hold a hearing, as a decision to hold a hearing is a matter of discretion. Section 1102(a) of the RTKL, 65 P.S. §67.1102(a); see, e.g., Bagwell 2015. Also, an appeals officer has discretion in developing the record. Id.

Requester had an opportunity to present evidence and to submit position statements to OOR, the fact-finder in these proceedings. He was able to respond to DHS' submissions, and develop a record as to its alleged constructive possession. These proceedings afforded Requester adequate process.

### b. Notice to Nursing Homes

Requester also faults OOR for failing to ensure that third parties other than the MCOs received notice of his RTKL appeal. Specifically, he argues the nursing homes should have received notice and an opportunity to participate because the Requested Rates are in their possession and DHS' putative control.

We reject Requester's attempt to assert purported due process rights of nursing homes. As an initial matter, their interest in the disclosure or non-disclosure of the Requested Rates is unclear. The MCOs identified a proprietary interest in non-disclosure of the Requested Rates as confidential proprietary information and trade secrets, for which pre-disclosure notice is required by Section 707(b) of the RTKL, 65 P.S. §67.707(b) (relating to requests for trade secrets). Requester identifies no legal basis for requiring notice to the nursing homes.

Presuming a legal basis exists for their alleged right to notice, it is unclear that the nursing homes are aggrieved by the lack of notice. Requester does not indicate that any nursing homes were harmed by an inability to participate in OOR's proceedings, or indeed, had any desire to participate. Requester identified no relationship to nursing homes different from any other member of the public. Although an attorney, he does not claim to represent their interests in the RTKL appeal. Cf. Meguerian v. Office of Att'y Gen., 86 A.3d 924 (Pa. Cmwlth. 2013). In

14

fact, Requester alleges no basis for asserting the nursing homes' alleged due process rights. Thus, he lacks standing to do so.[8]

As a matter of practicality, OOR cannot ensure notice is provided to any and all third parties whose information is implicated in a RTKL request. We decline Requester's invitation to impose such a duty on OOR where the statute does not. Moreover, the RTKL does not preclude a requester from providing notice to third parties who may have an articulable "direct interest in the record subject to an appeal" under Section 1101(c) of the RTKL, 65 P.S. §67.1101(c).

In sum, no statutory or decisional law requires notice to all third parties whose information may be responsive to a RTKL request. No evidence or representations show that nursing homes had an interest in notice or participation before OOR. Importantly, no one aggrieved by the alleged deprivation is before us, and such aggrievement is not apparent. Therefore, we reject Requester's due process claims as to lack of notice.

---

[8] Our Supreme Court explained:

> The core concept of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution to his challenge. A party is aggrieved for purposes of establishing standing when the party has a 'substantial, direct and immediate interest' in the outcome of litigation. A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative.

Office of the Governor v. Donahue, 98 A.3d 1223, 1229 (Pa. 2014) (citations omitted). Requester does not allege he is personally aggrieved by the lack of notice to nursing homes.

15

### 3. Automatic Stay

Before turning to the merits, we briefly address Requester's contention that there is no stay of disclosure under Section 1301(b) of the RTKL, 65 P.S. §67.1301(b). Section 1301(b) mandates: "A petition for review under [Section 1301] shall stay the release of documents until a decision [on the petition] is issued." Id. Requester emphasizes that Section 1301(a) of the RTKL does not include appeals by direct interest participants, and DHS (the agency) did not appeal. On that basis, he claims no "petition for review under this section" was filed to trigger the automatic stay.

However, here, there are three petitions for review. All of them initially invoked our statutory jurisdiction under Chapter 13 of the RTKL, which includes the automatic stay provision. The MCOs' petitions, as direct interest participants, also cite the jurisdictional basis set forth in our RTKL jurisprudence. Although Requester amended his cross-petition for review to cite different grounds for jurisdiction, the fact remains that Requester filed a timely petition for review challenging OOR's Final Determination. We decline Requester's invitation to splinter the Final Determination into slivers representing each entity or issue, enforcing each separately. Accordingly, the automatic stay of disclosure applies under a plain reading of Section 1301(b) of the RTKL.

Mindful of Requester's original jurisdiction action in mandamus to enforce the Final Determination,[9] where this Court requested supplemental briefs on the statutory stay, we reserve further analysis for our opinion in that matter.

## B. <u>Eiseman</u>

OOR relied significantly on <u>Eiseman</u> for its conclusion that the Requested Rates are financial records. Thus, we begin our analysis with a discussion of <u>Eiseman</u>, and its application here. We also consider its preclusive effect.

### 1. <u>Eiseman</u> Litigation & Decision

<u>Eiseman</u> involved four years of litigation, from the request through the appellate and enforcement stages. There, the requester sought rates paid by MCOs to dental service contractors, comprised primarily of organizational subcontractors and a few dentist providers (MCO Rates).[10] The request was limited to MCOs in the Southeast Zone of the HealthChoices program.[11]

DHS denied access, asserting trade secret and proprietary status of the MCO Rates based on the MCOs' objections. Significantly, DHS did not disclaim possession or raise any exceptions on its own behalf. On appeal to OOR, the MCOs

---

[9] We reject Requester's claims that OOR is compelled to enforce its Final Determination. To support his contention, Requester cites Pa. R.A.P. 3761 (relating to enforcement proceedings). The rule provides a mechanism for an agency to enforce its orders, but it imposes no duty upon an agency to expend resources in filing enforcement actions. Indeed, OOR had no such duty here.

[10] The requester also sought capitation rates paid by DHS to MCOs. However, once this Court held they were public, DHS disclosed them, so they were not at issue in Department of Public Welfare v. Eiseman, 125 A.3d 19 (Pa. 2015).

[11] The MCOs in <u>Eiseman</u> were Aetna Better Health, Inc., HealthAmerica Pennsylvania, d/b/a CoventryCares, Health Partners of Philadelphia, Inc., Keystone Mercy Health Plan, and United Healthcare of Pennsylvania, Inc.

participated under Section 1101(c) of the RTKL. OOR held a hearing, where the participants presented testimony of several witnesses, including experts, regarding the alleged proprietary and trade secret status of the MCO Rates. Based on this evidence, OOR granted the appeal and directed disclosure.

On further appeal to this Court, the MCOs argued OOR erred in holding the MCO Rates were financial records when they were not contained in a contract with DHS, and that OOR should have considered them proprietary information or trade secrets exempt under Section 708(b)(11) of the RTKL or the Trade Secrets Act. After briefing and argument en banc, and respectful of the length and complexity of the litigation, this Court undertook *de novo* review, and reconsidered the evidence before OOR. This Court[12] held the MCOs met their burden of proving the MCO Rates were protected under Section 708(b)(11) of the RTKL. The requester appealed further to our Supreme Court.

Based on the record and arguments raised in this Court and OOR, and confined to the questions on which it accepted appeal,[13] our Supreme Court decided Eiseman, reversing this Court "relative to the MCO Rates, and … remand[ing] for further proceedings consistent with this opinion." 125 A.3d at 33. It held: "documents required to be submitted to [DHS] reflecting the MCO Rates are

---

[12] The Honorable Patricia A. McCullough filed a concurring and dissenting opinion.

[13] The questions were limited to: whether the MCO Rates were financial records; and, whether they may be exempt as trade secrets/confidential proprietary information. As to the dilemma this posed based on DHS' newly claimed non-possession, the Court explained "[t]o the extent that [DHS] may encounter difficulties flowing from our present focus on those questions, these would appear to be substantially of its own making." Eiseman, 125 A.3d at 29. It thus disallowed DHS from "advanc[ing] shifting positions in opposing disclosure." Id.

'financial records' under the [RTKL]." Id. at 29 (emphasis added). It construed "financial records" broadly to "encompass records 'dealing with' disbursements of public money and services acquisitions by agencies." Id.

Importantly, the Court recognized the designation "financial records" does not include "all private contractor documents." Id. at 30. Rather, only private contractor documents that meet the "initial requirement" that the "documents must be submitted to a government agency for approval" fit within the category. Id. (emphasis added). The Court reasoned it is that submission requirement "which separates subcontracts containing the MCO Rates from third-party records (to which a distinct legal analysis applies, see [Section 506(d),] 65 P.S. §67.506(d))." Id. (emphasis added).

At the outset, our Supreme Court emphasized: "Significantly, [DHS] did not deny that it possessed pertinent records …." Id. at 22. It continued that DHS' assertion, for the first time on appeal to our highest court, that it "neither possesse[d] nor control[led] records reflecting the MCO Rates (and, thus, they are not 'records of an agency') [was] not well taken." Id. at 29. As a consequence, for purposes of its decision, "our [Supreme Court's] analysis presume[d] that [DHS] does have possession (since the standard contract requires submission of those contracts, and neither [DHS] nor the MCOs asserted non-possession as this litigation evolved as a basis for denying the relevant open-records requests.)" Id. at 31. *Presuming DHS' possession*, Eiseman held the MCO Rates are public financial records to which the trade secret/confidential proprietary exception did not apply.

19

On remand, this Court ordered disclosure of the MCO Rates in accordance with the Supreme Court's decision in <u>Eiseman</u>. With the MCOs agreement, DHS disclosed the rates paid to organizational subcontractors. Thereafter, the MCOs contended that rates paid directly to providers were not subject to disclosure under <u>Eiseman</u>. As a result, DHS did not disclose rates paid by MCOs to dentist providers.

The requestor filed a contempt petition. A hearing was conducted to discern DHS' reasons for withholding rates paid to providers while disclosing rates paid to organizational subcontractors. DHS presented testimony of several witnesses, all of whom testified as to DHS non-possession of *all* rates paid by MCOs, whether paid to organizational subcontractors or to providers.

In the Contempt Opinion, the undersigned explained that DHS' attempts to disclaim possession of the records were rejected by the Supreme Court. Moreover, the Supreme Court did not differentiate between rates paid directly to providers and those paid to organizational subcontractors; the focus was on the payor of the MCO Rates, not the recipient.[14] Contempt Op. at 3. As such, the undersigned concluded there was no basis for differentiating between the rates paid to subcontractors and those paid directly to providers, as both were paid *by* MCOs. As a result, this Court entered a citation for civil contempt and directed DHS to disclose the rates paid directly to providers.

---

[14] Similarly, <u>Dental Benefit Providers, Inc. v. Eiseman</u>, 124 A.3d 1214 (Pa. 2015), involved rates paid by subcontractors, thus focusing on the MCOs' subcontractors as payor.

20

## 2. OOR's Application of <u>Eiseman</u>

OOR erred in construing <u>Eiseman</u> to hold all rates paid by MCOs under the HealthChoices program are financial records without regard to the record and the narrow grounds on which our Supreme Court accepted the appeal. <u>Eiseman</u> does not apply here based on the evidentiary record before OOR.

DHS submitted proof to OOR (Penney Affidavit, Fisher Affidavit and Rock Affidavit) that it did not possess the Requested Rates. These affidavits substantiate that DHS does not receive, review or control the Requested Rates. DHS reviews only template contracts the MCOs then later execute with nursing homes; the templates do not contain the Requested Rates. Significantly, OOR credited this evidence and found there is no requirement for nursing homes to report the Requested Rates, and DHS did not possess them. Final Determination at 6. Nevertheless, OOR determined DHS had constructive possession of the Requested Rates because it had a contract with the MCOs.[15]

Relevant here, OOR likened this case to <u>Eiseman</u> without acknowledging that our Supreme Court presumed DHS' possession, and such possession was a prerequisite for its holding. Crucially, OOR disregarded the limiting language in <u>Eiseman</u> holding that only "documents <u>submitted to [DHS]</u> reflecting the MCO Rates are 'financial records.'" <u>Id.</u> at 8 (quoting <u>Eiseman</u>, 125 A.3d at 29-30). In stark contrast to <u>Eiseman</u>, here the credited evidence proves that

---

[15] As discussed later in this opinion, OOR erred in concluding DHS had constructive possession under Section 506(d)(1) of the RTKL, 65 P.S. §67.506(d)(1). Section 506(d)(1) does not pertain to "control" of non-possessed records by an agency. Instead, that section pertains to third-party records and contains two criteria (governmental function and direct relationship) for access to records in the possession of a third-party contractor. <u>SWB Yankees LLC v. Wintermantel</u>, 45 A.3d 1029 (Pa. 2012).

21

the Requested Rates were not submitted to DHS, much less approved by DHS. OOR overlooked this material distinction that renders Eiseman inapplicable.

Further, OOR construed the Contempt Opinion to hold "rates paid from the MCOs directly to the providers/nursing facilities are subject to access." Id. at 8. This construction was overly broad, and it disregarded the primacy of our Supreme Court's opinion. This Court's role on remand was to effectuate the Supreme Court's decision in Eiseman. In that role, this Court was confined to the record as developed by the parties and the facts as recognized by the Supreme Court.

Because DHS does not possess the Requested Rates, OOR erred in basing its Final Determination on Eiseman. Absent agency possession, access must be analyzed through Section 506(d)(1) of the RTKL. 125 A.3d at 30.

### 3. Preclusive Effect

Requester contends the parties to Eiseman are estopped from litigating the public nature of rates paid to nursing homes because the Supreme Court already concluded rates paid by MCOs to subcontractors, including providers, are financial records of DHS. We disagree.

Collateral estoppel bars a claim raised in a subsequent action when the following conditions are met: (1) the issue decided in the prior action is identical to one presented in a later action; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom estoppel is asserted was a party to the prior action "or in privity with a party to the prior action[;] and[,] (4) the party against

whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action." Maulsby, 121 A.3d at 588 (citations omitted). Requester does not establish the criteria for collateral estoppel.

As to the first criterion, the issues before this Court now and the Supreme Court in Eiseman are not identical. As discussed above, there are both factual and legal distinctions that render Eiseman inapposite. Unlike Eiseman, where possession was presumed, here possession was disproved. Without possession, records are not presumed public. See Section 305(a) of the RTKL, 65 P.S. §67.305(a). Agency possession thus determines the statutory path for access. Compare Section 901 of the RTKL, 65 P.S. §67.901 (relating to records in agency's possession, custody or control), with Section 506(d)(1) of the RTKL (relating to records in a contractor's possession). Once OOR determined DHS did not have possession, Eiseman did not control the analysis or the result.

As to the third and fourth criteria, the MCOs were not all parties to Eiseman, and none of them had the opportunity to litigate the public status of rates paid by MCOs to providers. Moreover, the Supreme Court in Eiseman did not analyze the MCO Rates under Section 506(d)(1) of the RTKL. This distinction is of significant moment, since Section 506(d)(1) is an operative provision here, where for records are outside an agency's possession. Further, our Supreme Court in Eiseman did not address whether the MCO Rates qualified as "records of an agency" in the first instance. Id. at 29.

23

In short, because <u>Eiseman</u> did not involve the same legal issues, and the parties did not have an opportunity to litigate the issues presented here, the doctrine of collateral estoppel does not preclude the MCOs' appeals.

**C. Section 901**

**1. Record of DHS**

Finally turning to the merits, first, we consider DHS' and the MCOs' argument that the Requested Rates do not qualify as records under the RTKL. Relying entirely on <u>Eiseman</u>, OOR did not address this issue.

As we recently emphasized in <u>Highmark, Inc. v. Voltz</u>, 163 A.3d 485 (Pa. Cmwlth. 2017) (<u>en banc</u>), "[t]he RTKL provides a means of access to *government* records." <u>Id.</u> at __; slip op. at 17 (emphasis added). Section 102 of the RTKL defines "record," in pertinent part. as:

> Information, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency.

65 P.S. §67.102. Thus, a "record" qualifies for access through the RTKL only when it "documents a <u>transaction or activity of an agency</u>." <u>Id.</u> (emphasis added).

This Court held "documents" in this context means "proves, supports [or] evidences." <u>Allegheny Cnty. Dep't of Admin. Servs. v. A Second Chance, Inc.</u>, 13 A.3d 1025, 1034-35 (Pa. Cmwlth. 2011) (<u>en banc</u>) (<u>ASCI I</u>). Thus, more than a mere relationship between the agency and the record is required—the record must show an agency transaction or activity.

24

The Requested Rates were privately negotiated between the MCOs and nursing homes. DHS disclaims any knowledge of the Requested Rates, and confirms that in addition to not possessing them, it does not receive them, obtain them, control them, or review them. R.R. at 237a-38a. It is undisputed that the MCOs do not submit them to DHS, and that DHS does not approve them. The Requested Rates are unrelated to DHS' oversight of HealthChoices, and are unnecessary for its compliance review of provider contracts. R.R. 241a-46a. Further, DHS does not use the Requested Rates to pay nursing home providers in the separate fee-for-service system. Id.

DHS' affidavits and the MCOs' affidavits substantiate these facts. Such affidavits are competent evidence, and sufficient proof under the RTKL. Sherry.

Because the Requested Rates do not "document" any transaction or activity of DHS, they are not "records" of an agency that are presumed public under the RTKL. Sections 102 and 305 of the RTKL, 65 P.S. §§67.102, 67.305(a). However, that does not end our inquiry. As discussed below, records in possession of a third party may be accessible under the RTKL in certain circumstances.

## 2. Constructive Possession: Agency "Control" of Record

Next, we consider Requester's contention that the Requested Rates are in DHS' constructive possession under Section 901 of the RTKL, 65 P.S. §67.901. Requester asserts DHS has control over the Requested Rates as part of its auditing function of the nursing homes compliance with regulations.

25

Under Section 901, "an agency shall make a good faith effort to determine … whether [it] has possession, custody or control of the identified record …." 65 P.S. §67.901 (emphasis added). By its plain language, Section 901 describes the steps an agency is obligated to take when it receives a record request. Office of the Budget v. Office of Open Records, 11 A.3d 618 (Pa. Cmwlth. 2011).

Constructive possession is the concept of accessing records "of" an agency that are outside an agency's possession, but are within its legal custody or control. See, e.g., Bagwell v. Dep't of Educ., 76 A.3d 81 (Pa. Cmwlth. 2013) (en banc) (non-agency records may qualify as "of" agency when they document agency activity; assess nexus of agency to record); Mollick v. Twp. of Worcester, 32 A.3d 859 (Pa. Cmwlth. 2011) (emails on personal computers of individuals may be subject to RTKL; character of the record, not location, determines access). However, the concept only applies to "records of an agency" that meet definitional parameters in the first instance. Dental Benefit Providers, Inc. v. Eiseman, 86 A.3d 932 (Pa. Cmwlth. 2014), aff'd, 124 A.3d 1214 (Pa. 2015). It is thus a distinct concept from agency possession under Section 506(d), which applies to contractor records only. Honaman v. Lower Merion Twp., 13 A.3d 1014 (Pa. Cmwlth. 2011). In conflating the two, OOR erred.

We reject Requester's constructive possession arguments premised on agency "control" of the record, for several reasons.

First, precedent precludes access to a private company's records based solely on an agency's legal right to review those records. Office of the Budget.

26

In Office of the Budget, OOR granted access to payroll records that were in possession of a third-party contractor performing masonry for a school project in the City of York. However, OOR recognized the contract for masonry services was not a governmental function; thus, the records were not reachable under Section 506(d) of the RTKL. Nonetheless, OOR determined the payroll records were accessible because they were within the Office of Budget's control. The theory of control was that the agency had a right to audit those records based on its authority and duty under a grant agreement to ensure subcontractors were compliant with the Prevailing Wage Act.[16]

On appeal to this Court, OOR argued that records to which the agency had a right to review and audit were within an agency's putative control. Therefore, under the language of Section 901 of the RTKL, "possession, custody, or control," such records, if public, were subject to disclosure. 65 P.S. §67.901. This Court squarely rejected OOR's proffered construction of Section 901.

We reasoned that to construe Section 901 so broadly would render Section 506(d) of the RTKL (third-party records) "mere surplusage." 11 A.3d at 622. Thus, we explained that records of a private company, not in an agency's possession, and not related to a contract to perform a governmental function, were not reachable under the RTKL.

---

[16] Act of August 15, 1961, P.L. 987, as amended, 43 P.S. §§165-1—165-17.

Our reasoning in Office of the Budget is equally applicable here. That DHS has a right to audit or review certain records does not render all potentially reviewable records within DHS' control. Nothing in the RTKL compels DHS to exercise the right to review or audit, or imposes a duty on DHS to obtain records subject to review or auditing from private third parties. That the Requested Rates are in the possession of the nursing homes DHS regulates generally does not render them accessible under Section 901 ("control" of record) for the same reason. Id.

Second, contrary to Requester's assertions, no applicable regulation requires the Requested Rates to be submitted to DHS. While the MCOs are not required to submit the Requested Rates to DHS for approval or otherwise, Requester maintains the nursing homes are required to submit information containing the Requested Rates to DHS. Specifically, he cites the MA regulations pertaining to cost reports. 55 Pa. Code §§1187.71, 1187.77.

Such cost reports are filed by nursing homes, not the MCOs. The regulation enumerates the costs required on a cost report, which captures the costs the nursing homes pay when providing services to MA residents. Id. Noticeably absent from the list are amounts of revenue, like payments received *from* MCOs, i.e., the Requested Rates. Indeed, the regulation does not pertain to nursing homes' revenue streams or amounts. From our review of the cited regulations, they do not require submission of the Requested Rates to DHS.[17] Thus, DHS does not have custody or control of the Requested Rates by regulation.

---

[17] Further, such records are not "in the hands of MCOs contracting with DHS" as Requester specified. Reproduced Record (R.R.) at 8a. Requester cannot modify his request on appeal. Pa. State Police v. Office of Open Records (George), 995 A.2d 515 (Pa. Cmwlth. 2010).

Third, and most fundamental, constructive possession under Section 901 is not the proper mechanism to reach records of a third-party contractor. In Dental Benefit Providers, Inc. v. Eiseman, the companion case to Eiseman, our Supreme Court held "that the [RTKL] channels access to third-party records through Section 506(d)(1) [of the RTKL, 65 P.S. §67.506(d)] …." 124 A.3d 1214, 1223 (Pa. 2015).

Like this Court in Office of the Budget, in Dental Benefit Providers our Supreme Court recognized that access under Section 901 is necessarily limited to the definitional parameters of a record in Section 102. It explained:

> Nevertheless, Section 901 explicitly harkens back to the essential concept of a 'public record,' 65 P.S. §67.901, and the incorporated definition of a "record" does encompass the notion of a 'transaction or activity of an agency' to which the intermediate court majority has rightfully afforded meaning, id. §67.102. While in light of the policy of liberal construction of the instant remedial statute these terms should be construed broadly … they simply cannot be ignored, since, at bottom, our present task is one of statutory construction, not independent judicial policymaking.

Dental Benefit Providers, 124 A.3d at 1223 (emphasis added). Accordingly, OOR erred in allowing access to records of a contractor through constructive possession in place of the statutory access afforded by Section 506(d) of the RTKL.

For the foregoing reasons, we conclude the Requested Rates are not within DHS' constructive possession, and are not accessible under Section 901 of the RTKL (agency "control" of record). As such, we reject Requester's claim that

29

OOR committed legal error when it did not analyze access to the Requested Rates under that provision.

### 3. "Financial Record"

In addition to determining whether it has possession, custody or control of a requested record, under Section 901 of the RTKL an agency must assess whether records are "financial records." 65 P.S. §67.901. Without analyzing the term, OOR concluded the Requested Rates were financial records to which exemptions, other than those specified in Section 708(c) of the RTKL, 65 P.S. §67.708(c), do not apply. Neither the Supreme Court in Eiseman nor this Court in the Contempt Opinion held these rates were financial records. Therefore, we examine whether the Requested Rates fall within the definitional parameters.

The RTKL defines "financial record" in pertinent part as, "any account, voucher or contract dealing with: (i) the receipt or disbursement of funds by an agency; or (ii) an agency's acquisition, use or disposal of services, supplies, materials, equipment or property." Section 708(c) of the RTKL provides that as to "financial records," the RTKL exceptions contained in Section 708(b) of the RTKL shall not apply, "except that an agency may redact that portion of a financial record protected under subsection (b)(1), (2), (3), (4), (5), (6), (16) OR (17)." 65 P.S. §67.708(c) (all caps in original).

This Court construes statutory terms according to their plain language. 1 Pa. C.S. §1903; Office of the Governor v. Donahue, 98 A.3d 1223 (Pa. 2014). We presume that, "[w]hen a court of last resort has construed the language in a statute, the General Assembly in subsequent statutes on the same subject matter intends the

same construction to be placed upon such language." 1 Pa. C.S. §1922(4). We also consider decisional law.

In Eiseman, our Supreme Court construed the term "financial records" broadly to encompass more than those records that are facially accounts, vouchers or contracts. When it did so, it resurrected its essential component analysis under the former Right-to-Know-Law (Law).[18] Id. at 29-30 (noting legislature "reposited in the definition of 'financial record' under the [RTKL]" language from the former Law's definition of public record; citing N. Hills News Record v. McCandless, 722 A.2d 1037 (Pa. 1999)). It explained records "dealing with" disbursements of agency funds would necessarily include "dental-services subcontracts which must be submitted to and approved by [DHS]." Id. at 30 n.8 (emphasis added).

In construing the phrase "dealing with" broadly, our Supreme Court did not sever the tether between government action and record access. That is confirmed by the companion case, Dental Benefits Providers, which recognizes the only means of access to records in a private contractor's possession is through Section 506(d). 125 A.3d at 1222. There, our Supreme Court discredited the requester's argument that the rates paid to dental-service providers, as downstream payments of government funds, were sufficiently connected to agency disbursements to qualify as financial records of DHS. Instead, it reasoned access had to be evaluated under Section 506(d), pertaining to records in a third-party contractor's possession.

---

[18] Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §§66.1-66.4, repealed by Section 3102(2)(ii) of the RTKL, 65 P.S. §67.3102(2)(ii).

31

Moreover, by its plain language, the definition is confined to an "account, voucher or contract …." Section 102 of the RTKL, 65 P.S. §67.102. This qualifier was met in Eiseman because the Court presumed the subcontracts submitted to DHS contained the MCO Rates. On that basis, it held "subcontracts containing MCO Rates plainly 'deal with' [DHS'] disbursement of billions of dollars of public monies to provide access to essential healthcare to vulnerable populations." Id. at 30. Here, by contrast, the record establishes the Requested Rates are not contained in contracts submitted to DHS. Therefore, they do not qualify under the plain language of the definition.

Nor do the Requested Rates qualify as "financial records" under an essential component analysis. Under the former Law, our Supreme Court created the essential component test, allowing access to records that were an essential part of one of the two defined categories of "public records:" (1) minute/order/decision; or, (2) account/voucher/contract. McCandless; Sapp Roofing Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 12, 713 A.2d 627 (Pa. 1998) (plurality op.) (reasoning private contractor's wage records were accessible under former Law because statutory duty required agency to ensure wages owed workers were paid, amount of wages was essential to agency's review). When our Supreme Court noted the MCO Rates were records of an agency under the essential component test, it noted they were "an essential component of an agency decision, i.e., approval of the subcontract." Eiseman, 125 A.3d at 30 n.10 (emphasis added).

Importantly, Requester does not assert the Requested Rates are an essential part of DHS' oversight of HealthChoices, or contract compliance review,

32

or are otherwise "essential" for DHS to perform its duties. Indeed, he did not raise the essential component test in his initial appeal. R.R. at 1a-11a. Rather, Requester emphasized the Requested Rates were within DHS' control under the regulatory scheme based on DHS' right to audit.[19] See Designated Resp't's Br. at 36-43. That argument is meritless, as explained above.

Requester now asserts the Requested Rates are financial records because they relate to the paid "MA days of care" reported on a cost report. He posits that inclusion of a reference to the 100% payment by MCOs to nursing homes in the definition of "MA day of care" renders the Requested Rates an "essential component" of an MCO "day of care." That tenuous connection does not meet the test.

Requester disregards that the Requested Rates themselves must be an "essential component" of a "public record" as defined by the statute. McCandless. Simply put, as used here, the term "essential component" refers to an agency's "account, voucher or contract." Section 102 of the RTKL, 65 P.S. §67.102 (definition of "financial record"). Significantly, Requester does not identify the purported agency account, voucher or contract of which the Requested Rates constitute an essential component.

Instead, Requester insists DHS must know the Requested Rates because the *number* of the "MA days of care" is reported on MA cost reports submitted by nursing homes. The number of days is then used to calculate disproportionate share

_____

[19] Requester argued "DHS must have or require that information in its records to monitor/edit/audit that MA days reported by nursing facility providers and used by them to seek payment from DHS itself are correct …. Without that information, DHS could not perform its statutory duties to control for provider fraud and abuse and false claims." R.R. at 315a.

33

incentive payments under 55 Pa. Code §1187.111, one of numerous gross adjustments to nursing home payments under the MA program. See 55 Pa. Code §§1187.108-.115. That DHS calculates the disproportionate share incentive payments without the Requested Rates shows they are not "essential."

At best, Requester's convoluted argument suggests that the "MA days of care" meets the essential component test. However, Requester seeks the amounts paid, not the number of MA days of care. Requester fails to direct us to a regulation that requires DHS to use or review the *amounts* paid by MCOs for the days of care.

Requester construes "financial record" to encompass any information (Requested Rates) that bears a relationship to information reported to an agency (MA day of care), that the agency then uses in making a disbursement (disproportionate share incentive payments).[20] He makes this leap without regard to DHS' evidence that it does not use, does not review, and does not know the Requested Rates. Such a broad construction erodes any principled connection between the requested record and the RTKL's purpose to ensure transparency in government. As discussed elsewhere, for access, the records must either qualify as records of an agency under the definition in Section 102, or qualify under the two-pronged test contained in Section 506(d). Dental Benefit Providers.

In sum, Requester fails to establish that the Requested Rates, which are unknown to and not used by DHS in performing its functions, are an essential

---

[20] The Request did not refer to "disproportionate share incentive payments" or "MA day of care." See R.R. at 20a. Such records are not in the hands of the MCOs as Requester specified. Id. at 8a.

34

component of any account, voucher, or contract. Additionally, because the Requested Rates are not financial records under Eiseman, OOR erred in holding they were subject to disclosure on that basis.

**D. Section 506(d): "Directly Relates" to a "Governmental Function"**

The RTKL provides access to records that do not qualify as a "record" of an agency through Section 506(d)(1) of the RTKL, 65 P.S. §67.506(d)(1). SWB Yankees LLC v. Wintermantel, 45 A.3d 1029, 1044 (Pa. 2012) ("it would undermine the clear aim of Section 506(d)(1)—which recasts certain third-party records bearing the requisite connection to government as public records 'of the [government] agency,' 65 P.S. §67.506(d)(1)—to require that the materials actually be 'of such agency' in the first instance."). We recognize Section 506(d)(1) is the General Assembly's effort to preserve "some level of public access to information about governmental functions … where an agency chooses to contract out the performance of that function to a third-party." ASCI I, 13 A.3d at 1039.

Section 506(d), entitled "Agency Possession," provides access to records in possession of a third-party contractor as follows:

> (1) A public record that is not in the possession of an agency but is in the <u>possession of a party with whom the agency has contracted to perform a governmental function</u> on behalf of the agency, **and** which <u>directly relates to the governmental function</u> and is not exempt under this act, shall be considered a public record of the agency for purposes of this act.

65 P.S. §67.506(d)(1) (emphasis added). Section 506(d)(2) of the RTKL provides: "Nothing in this act shall be construed to require access to any other record of the party in possession of the public record." 65 P.S. §67.506(d)(2).

35

For purposes of access under the RTKL, a third-party contractor's records are treated as records of an agency when the two conditions in Section 506(d)(1) of the RTKL are met. Allegheny Cnty. Dep't of Admin. Servs. v. Parsons, 61A.3d 336 (Pa. Cmwlth. 2013) (ASCI II). They are: (1) the contractor must perform a "governmental function;" and, (2) the requested record must "directly relate" to that governmental function. SWB Yankees.

### 1. Governmental Function

In Eiseman, our Supreme Court recognized that MCOs provide a "vital governmental function" in providing health services to MA recipients under the HealthChoices program. Id. at 29. The MCOs perform that function pursuant to the HealthChoices contract. Therefore, the first prong of Section 506(d) is met. However, it remains undecided whether rates paid to service providers under the HealthChoices program directly relate to the health services function. Cf. Dental Benefit Providers (rates paid to dentist providers by subcontractors are not accessible under the RTKL because subcontractors had no contract with agency).

### 2. Direct Relationship

Access is further restricted to only those contractor records that "directly" relate to carrying out the governmental function. ASCI I, 13 A.3d at 1038. This prevents access to records that may relate to the contract but do not relate to its performance. Id.

In ASCI II, this Court en banc confirmed the direct relationship must pertain to the *performance* of the governmental function. Id. (identifiers and hire dates of contractor's employees were not material to performing governmental function, and so not directly related); see also Giurintano v. Dep't of Gen. Servs., 20 A.3d 613 (Pa. Cmwlth. 2011) (names of interpreters who did not provide services did not directly relate to contract). As a consequence, the contract must be examined to assess whether the information sought had a direct bearing on the third-party contractor's obligations thereunder.

From this record, it is clear that knowledge of the Requested Rates was not necessary for DHS to assure compliance with the HealthChoices contract. There is no indication that DHS uses the information to monitor compliance with the contract, or that it relates to its oversight. Indeed, DHS administers the HealthChoices program without this information. As in ASCI II, "[t]he [requested information] was unknown to the [agency] and did not affect the services rendered. Also, the requested information did not pertain to performance of the contract." Id. at 341-42. These same factors undercut such a direct relationship here.

Also, under our precedent, mere cost information does not directly relate to performance of a governmental function. Dep't of Corr. v. Buehl, 6 A.3d 27, 30-31 (Pa. Cmwlth. 2010). To the extent the Requested Rates represent no more than the costs of services, as on a cost report, the relationship is not direct. Id. (purchase cost of commissary items to be resold not directly related to performing governmental function, and so inaccessible).

37

Nevertheless, OOR did not analyze how the amount of the Requested Rates directly relates to the MCOs performing their governmental function under the HealthChoices contract. Accordingly, we remand to OOR to analyze the direct relationship prong under Section 506(d)(1) of the RTKL.

On remand, OOR needs to review the MCO HealthChoices contracts, and include the contracts in the evidentiary record to ensure adequate appellate review. ASCI I, 13 A.3d at 1034-35. To that end, we direct the MCOs supplement the record before OOR to include the relevant contracts.

## E. Exemptions

In the event OOR determines that the Requested Rates meet the two-prong test under Section 506(d)(1) of the RTKL, its next step is to assesses their public status.[21] A third-party contractor, which steps into the shoes of an agency by virtue of performing a governmental function, is entitled to raise any applicable exemptions to disclosure. ASCI II.

OOR did not analyze the application of the MCOs' asserted exemptions, here Section 708(b)(11) and the trade secret status of the rates.[22]

---

[21] In the event OOR determines the Requested Records do not relate to the MCOs' performance of their governmental function, it need not analyze the exemptions.

[22] In Eiseman, our Supreme Court determined that the RTKL's specific treatment of trade secrets in Section 708(b)(11) of the RTKL supplants the Trade Secrets Act. Eiseman, 125 A.3d at 32. It also noted that provider "rates are not a close fit with the concept of a 'trade secret.'" Id. Thus, the trade secret status of the Requested Rates is unclear. Nonetheless, we defer to OOR to conduct the appropriate analysis under the trade secret statutes asserted in the initial appeal.

38

Accordingly, we remand to OOR to assess the exemptions in the first instance, if necessary. On remand, OOR shall make findings regarding the exemptions and, ultimately, determine whether the Requested Rates are public under the RTKL.

### IV. Conclusion[23]

For the foregoing reasons, we reverse OOR's Final Determination directing disclosure because the Requested Rates are not financial records of DHS. Further, we remand the matter to OOR to determine whether there is a direct relationship between the Requested Rates and the MCOs' performance of their contract obligations under their contracts with DHS, and, if necessary, to apply any exemptions asserted in its initial proceeding.

On remand, OOR shall be limited to the current evidentiary record, with one addition: the MCOs shall submit a copy of the contracts to which MCOs and DHS are parties, pursuant to which the MCOs agreed to manage the purchase and provision of health services, specifically, nursing home services, in the HealthChoices program.

ROBERT SIMPSON, Judge

---

[23] In his cross-petition, Requester claims he is entitled to disclosure of Health Partners' rates, and general enforcement of OOR's Final Determination. However, because these are the primary claims in Requester's separate original jurisdiction action, we reserve judgment on them. Because Health Partners was a direct interest participant before OOR, it remains subject to the OOR's decision on remand.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

UnitedHealthcare of Pennsylvania, : 
Inc., Aetna Better Health Inc., :
UPMC for You, Inc., Geisinger :
Health Plan, AmeriHealth Caritas :
of Pennsylvania, AmeriHealth :
Caritas Northeast, and Keystone :
First, :
                   Petitioners :
                    :
          v. : No. 1357 C.D. 2016
                    :
Bruce Baron, :
                 Respondent :

Gateway Health Plan, Inc., :
                 Petitioner :
                    :
          v. : No. 1358 C.D. 2016
                    :
Bruce G. Baron, Esq., :
                 Respondent :

Bruce G. Baron, :
                 Petitioner :
                    :
          v. : No. 1427 C.D. 2016
                    :
Department of Human Services; :
United Healthcare of Pa., Inc.; :
Aetna Better Health Inc.; UPMC :
for You, Inc.; Geisinger Health Plan; :
AmeriHealth Caritas of Pa.; :
AmeriHealth Caritas Northeast; :
Keystone First; Gateway Health Plan, :
Inc.; and Health Partners Plan, Inc., :
                 Respondents :

# O R D E R

**AND NOW**, this 5th day of October, 2017, the Final Determination of the Office of Open Records (OOR) is **REVERSED**. The matter is remanded to OOR on the current record, with one addition: the HealthChoices contracts between the Department of Human Services (DHS) and the Managed Care Organizations (MCOs). Accordingly, the MCOs are **DIRECTED** to supplement the record before OOR to include the operative contracts within 30 days.

We REMAND this matter to OOR to address the following issues:

(1) Do the rates the MCOs pay to nursing home providers directly relate to the performance of the MCOs' contractual obligations to DHS under the HealthChoices contract as required by Section 506(d) of the Right-to-Know Law,[24] 65 P.S. §67.506(d)?

(2) If so, are those rates exempt under the asserted exemptions, Section 708(b)(11) of the RTKL, 65 P.S. §67.708(b)(11), or other laws protecting trade secrets?

**OOR SHALL ISSUE** a new final determination, consistent with this order and the foregoing opinion, within 30 days of its receipt of the contracts.

**AND FURTHER**, Designated Respondent's Application to Quash the Notice of Intervention filed by Health Partners Plans, Inc. is **GRANTED** without prejudice to its status as a direct interest participant. As such, Health Partners Plans, Inc. may challenge OOR's decision on remand in accordance with applicable law.

Jurisdiction is relinquished.

---

[24] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101–67.3104.

ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

UnitedHealthcare of Pennsylvania, Inc., :
Aetna Better Health Inc., UPMC for :
You, Inc., Geisinger Health Plan, :
AmeriHealth Caritas of Pennsylvania, :
AmeriHealth Caritas Northeast, and :
Keystone First, :
               Petitioners :   No. 1357 C.D. 2016
                                 :
           v. :
                                 :
Bruce Baron, :
               Respondent :

Gateway Health Plan, Inc., :
               Petitioner :
                                 :   No. 1358 C.D. 2016
           v. :
                                 :
Bruce G. Baron, Esq., :
               Respondent :

Bruce G. Baron, :
               Petitioner :
                                 :   No. 1427 C.D. 2016
           v. :   Argued: June 7, 2017
                                 :
Department of Human Services; :
United Healthcare of Pa., Inc.; Aetna :
Better Health Inc.; UPMC for You, :
Inc.; Geisinger Health Plan; :
AmeriHealth Caritas of Pa.; :
AmeriHealth Caritas Northeast; :
Keystone First; Gateway Health :
Plan, Inc.; and Health Partners :
Plan, Inc., :
               Respondents :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JOSEPH M. COSGROVE, Judge


CONCURRING/DISSENTING OPINION
BY JUDGE McCULLOUGH                          FILED:  October 5, 2017


        I concur with the Majority insofar as it:  grants the application of Bruce
Baron (Requestor) to quash the notice of intervention filed on behalf of Health
Partners Plans, Inc.; rejects Requestor's due process challenges; concludes that the
automatic stay of disclosure set forth in section 1301(b) of the Right-To-Know Law
(RTKL)[1] applies here; and concludes that estoppel, premised upon the Supreme
Court's decision in *Department of Public Welfare v. Eiseman*, 125 A.3d 19 (Pa.
2015), is inapplicable here.

        However, I respectfully dissent from the Majority insofar as it:
concludes that *Eiseman* is distinguishable and inapplicable here; concludes that the
requested records are not within the control of the Department of Human Services
(DHS) and are not financial records under section 901 of the RTKL, 65 P.S. §67.901;
and remands to the Office of Open Records (OOR) to analyze the direct relationship
prong under section 506(d)(1) of the RTKL, 65 P.S. §67.506(d)(1).  Contrary to the
Majority, I believe that OOR properly applied *Eiseman* herein to conclude that the
requested records are financial records and not subject to exception as a trade secret
or confidential proprietary information.  Additionally, I would affirm the Final

_____
[1] Act of February 14, 2008, P.L. 6, 65 P.S. §67.1301(b).

PAM - 2

Determination of OOR that the requested records are within DHS' possession under section 506(d)(1) of the RTKL.

In *Eiseman*, our Supreme Court reversed this Court's holding that managed care organization (MCO) rates were protected from disclosure under the trade secrets/confidential proprietary information exception found in section 708(b)(11) of the RTKL, 65 P.S. §67.708(b)(11). The Court in *Eiseman* concluded that the requested documents therein, namely, the rates paid by certain MCOs to providers of dental services in the southeast zone of Pennsylvania, constituted "financial records" under section 102 of the RTKL, 65 P.S. §67.102, to which the trade secrets/confidential proprietary information exception did not apply. Although these MCO rates were negotiated directly between MCOs and the providers, the Court stressed that MCOs were required to submit subcontracts delegating their healthcare-related responsibilities to DPW for that agency's approval and that, ultimately, these subcontracts "plainly 'deal with' DPW's disbursement of billions of dollars of public monies to provide access to essential healthcare to vulnerable populations, as well as [DPW's] acquisition of services to meet its own obligations under federal and state law (albeit through middlemen)." *Eiseman*, 125 A.3d at 30.

I believe this same rationale applies equally here. While the public monies are disbursed to the MCOs and the MCOs then pay these monies to providers based upon privately negotiated rates, the character of the same as public monies does not change. Similar to the MCOs in *Eiseman*, the MCOs in this case have contracted with DHS to perform the governmental function of rendering the services that are part of the MA program and the MCOs simply act as the middlemen in the disbursement of public monies for the provision of these services. Our Supreme Court in *Eiseman* concluded that the term "financial records" should be broadly

PAM - 3

construed to "encompass records 'dealing with' disbursements of public money and services acquisitions by agencies." *Eiseman*, 125 A.3d at 29 (citations omitted). Consistent with *Eiseman*, I believe the records requested in this case likewise constitute "financial records" under the RTKL. As such, section 708(c) of the RTKL, 65 P.S. §67.708(c), renders the trade secrets/confidential proprietary information exception inapplicable to these records.

Nevertheless, the Majority agrees with designated Petitioners herein that *Eiseman* is distinguishable from the present case because the former was premised on the review and approval of MCO rate contracts by DHS (then referred to as DPW), whereas DHS in this case does not provide such direct review and approval of the MCO rates paid to nursing home service providers that participate in the Medical Assistance (MA) program, HealthChoices. While I agree that DHS' possession, as well as its review and approval of, the MCO rate contracts was a significant consideration for the Court in *Eiseman*, I disagree with the Majority that the requested records in this case were not subject to DHS' review. Although the Majority correctly states that OOR credited the affidavits submitted by DHS which established that participating nursing home service providers were not required to report the rates paid by the MCOs, OOR found that said providers were required to report their MA MCO days on their MA-11 cost report.

Indeed, DHS' regulations expressly incorporate MCO rates paid to nursing home service providers into the definition of a "MA day of care," *see* 55 Pa. Code §1187.2,[2] and these providers are required to submit MA-11 cost reports to

_____

[2] This regulation defines "MA day of care" as follows:

A day of care for which one of the following applies:

DHS within 120 days following close of the fiscal year, *see* 55 Pa. Code §1187.73(b).[3]  Additionally, DHS is required to audit and verify the records of nursing home service providers with respect to MCO days and rate payments, and these providers are required to retain fiscal records to support their cost reports.  *See* 55 Pa. Code §1187.77.[4]  Further, DHS is required by both federal and state law to

---

> (i) The Department pays 100% of the MA rate for an MA resident.
>
> (ii) The Department and the resident pay 100% of the MA rate for an MA resident.
>
> (iii) An MA MCO or an [Long-Term Care Capitated Assistance Program] provider that provides managed care to MA residents, pays 100% of the negotiated rate or fee for an MA resident's care.
>
> (iv) The resident and either an MA MCO or LTCCAP provider that provides managed care to an MA resident, pays 100% of the negotiated rate or fee for an MA resident's care.
>
> (v) The Department pays for care provided to an MA resident receiving hospice services in a nursing facility.

55 Pa. Code §1187.2.

[3] This regulation provides, in pertinent part, that "[a] nursing facility shall submit an acceptable MA-11 to the Department within 120 days following the June 30 or December 31 close of each fiscal year as designated by the nursing facility. An acceptable MA-11 is one that meets the requirements in §1187.71(e) (relating to cost reporting)."  55 Pa. Code §1187.73(b).  Section 1187.71(a) of the regulations sets forth an exhaustive list of 49 different costs, including resident care costs, other resident related costs, administrative costs, and capital costs, that are part of the MA-11 cost report.  55 Pa. Code §1187.71(a).  Sections 1187.71(d) and (e)(4) require a nursing facility to maintain and submit financial and statistical records, and any other documentation, verifying these costs.  55 Pa. Code 1187.71(d), (e)(4).

[4] This regulation provides that:

oversee the MA program.  More specifically, federal law requires DHS to enlist

providers so that MA care and services are available, *see* 42 U.S.C. §1396a(a)(30),[5]

_____

**(a)** The Department will audit acceptable cost reports filed to verify nursing facility compliance with:

**(1)** This chapter.

**(2)** Chapter 1101 (relating to general provisions).

**(3)** The schedules and instructions attached to the MA-11.

**(b)** A nursing facility shall make financial and statistical records to support the nursing facility's cost reports available to State and Federal representatives upon request.

**(c)** The Department will conduct audits in accordance with auditing requirements set forth in Federal regulations and generally accepted government auditing standards.

**(d)** The Department will conduct an audit of each acceptable cost report with an end date of June 30, 1996, or December 31, 1996, and thereafter within 1 year of the Department's acceptance of the cost report. This subsection will not apply if the nursing facility is under investigation by the Attorney General.

**(e)** The auditor will certify to the Department the allowable cost for the nursing facility to be input into the [Nursing Information System] database for use in determining the median costs.

**(f)** A nursing facility that has certified financial statements, Medicare intermediary audit reports with adjustments and Medicare reports for the reporting period shall submit these reports with its cost report, at audit or when available.

55 Pa. Code §1187.77(a)-(f).

[5] Section 1396a(a)(30) of the Federal Social Security Act addresses state plans for medical assistance and requires a state plan to:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . .

and state law requires DHS to promulgate payment regulations for nursing home providers to pay the providers for services rendered to eligible recipients, *see* section 443.1(7) of the Human Services Code (Code),[6] and to ensure providers' compliance with the Code and DHS regulations, *see* section 1402(e) of the Code, 62 P.S. §1402(e).[7]

In light of the federal and state law requirements and DHS' regulations, it would appear that DHS has the necessary "possession, custody or control" of the requested records as required by section 901. However, I would note that OOR never made a determination as to section 901, and a remand would be warranted in that regard.

Instead, OOR found that DHS maintained possession under section 506(d)(1) of the RTKL, which provides that:

> as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C. §1396a(a)(30).

[6] Act of June 13, 1967, P.L. 31, added by the Act of July 31, 1968, P.L. 904, *as amended*, 62 P.S. §443.1(7). This section states, in pertinent part, that:

> payments to county and nonpublic nursing facilities enrolled in the medical assistance program as providers of nursing facility services shall be determined in accordance with the methodologies for establishing payment rates for county and nonpublic nursing facilities specified in the department's regulations and the Commonwealth's approved Title XIX State Plan for nursing facility services . . . .

[7] Section 1402(e) of the Code provides that "[e]ach nursing facility shall be inspected at least twice annually for compliance with this act and regulations of the department." 62 P.S. §1402(e).

> A public record that is not in the possession of an agency but is in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the agency, and which directly relates to the governmental function and is not exempt under this act, shall be considered a public record of the agency for purposes of this act.

65 P.S. §67.506(d)(1).

In *Dental Benefit Providers, Inc. v. Eiseman*, 124 A.3d 1214 (Pa. 2015), our Supreme Court held that rates paid by subcontractors to providers were not subject to disclosure under section 506(d)(1) because there was no actual contract between DHS and the providers. In other words, the payments in such a case were twice removed from DHS, i.e., DHS paid an MCO, the MCO paid a subcontractor, and the subcontractor then paid the provider. However, in this case, DHS had contracted with the MCOs to administer services under the MA HealthChoices program; thus, the MCOs stand in the shoes of DHS when contracting with, and making payment to, the nursing home service providers. Hence, I would affirm the Final Determination of OOR concluding that the rates paid by the MCOs to the nursing home service providers constitute a public record of DHS under section 506(d)(1).

_____
PATRICIA A. McCULLOUGH, Judge