IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Real Alternatives, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Department of Human Services | : | |
| and Equity Forward (Office of | : | |
| Open Records), | : | No. 986 C.D. 2020 |
| Respondents | : | |
| | : | |
| | : | |
| Equity Forward and Mary Alice Carter, | : | |
| Petitioners | : | |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Department of Human | : | |
| Services (Office of Open Records), | : | No. 1002 C.D. 2020 |
| Respondent | : | Argued: March 7, 2022 |

BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION
BY JUDGE FIZZANO CANNON        FILED: July 19, 2022

Before us are the consolidated appeals of Equity Forward and its Executive Director, Mary Alice Carter (jointly, Requester), and Real Alternatives from the September 11, 2020 final determination issued by the Pennsylvania Office of Open Records (OOR) following remand by this Court. Upon review, we affirm.

## I. Background

In 2012, Real Alternatives, a private non-profit corporation, entered into a grant agreement (Grant Agreement) with the Pennsylvania Department of Human Services (DHS),[1] by which Real Alternatives agreed to assist in administering Pennsylvania's Alternatives to Abortion Program (Program) by "arrang[ing] for the provision of direct alternatives to abortion services, statewide, to clients requiring alternatives to abortion services."  Grant Agreement, Rider 2, Work Statement (Work Statement) at 1, Reproduced Record (R.R.) at 88a; *see also* Grant Agreement, Rider 2, Work Plan (Work Plan) at 1, R.R. at 93a; Grant Agreement at 1, R.R. at 81a.  The Grant Agreement sets forth the following client services plan:

> Real Alternatives, through its network of pro-life [s]ervice [p]roviders, reaches out to each woman, no matter [] her background or circumstances, and without fee. . . . Compassionate trained counselors assess each woman's situation and assist her in developing a positive approach to her pregnancy.  Support during the parenting or adoption decision involves counseling, education, material assistance, and referrals. . . .
>
> . . . .
>
> Depending on the Program funding level, Real Alternatives will advertise statewide using television, radio, and other media that reach the greatest number of potentially pregnant women as effectively and efficiently as possible, and to the extent fiscally possible. . . .
>
> . . . .
>
> The . . . Program primarily provides core services consisting of information and counseling that promote[] childbirth instead of abortion and assist[s] pregnant

---

[1] At the time the Grant Agreement was executed, DHS still functioned as the Department of Public Welfare.

women in their decision regarding adoption or parenting. The [P]rogram also provides support services including client self-administered pregnancy test kits, baby food, maternity and baby clothing and baby furniture, as well as information, education, and referrals for other services for the needs of the women and newborn. The information and education provided include[] topics regarding prenatal care, childbirth, adoption, parenting, and the use of abstinence to avoid unplanned pregnancies and sexually transmitted diseases.

Work Plan at 3-4, R.R. at 95a-96a. "Service [p]roviders are reimbursed for the core and support services rendered to women pursuant to a fee-for-service model." *Id.* at 3, R.R. at 95a. A potential service provider interested in providing services under the Program must operate as a non-profit organization that does not charge fees to eligible clients; have been in operation a minimum of one year providing core alternatives to abortion services, such as information and counseling promoting childbirth rather than abortion and assisting women in parenting or adoption decisions; and provide education promoting abstinence as the "best and only method" for avoiding unplanned pregnancies and sexually transmitted infections. *Id.* at 6, R.R. at 98a.

In September 2017, Requester submitted to DHS a request (Request) under the Right-to-Know Law (RTKL)[2] seeking the following records pertaining to the Grant Agreement:

1: All "Program[3] Development and Advancement Agreements" [(PDAAs)] signed between Real Alternatives,

_____

[2] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

[3] We note that the Request does not define or otherwise clarify to what "Program" refers. *See* Request at 1-2, R.R. at 28a-29a. Real Alternatives and service providers entered into the Program Development and Advancement and Agreements (PDAAs) to "develop and advance *other* life affirming programs both locally and nationally." *See* Affidavit of Kevin I. Bagatta (First

3

or its predecessor groups[,] Morning Star Pregnancy Services and Morning Star Project [Women in Need (WIN)] Advisory Council and its Pennsylvania "service providers."

2: All invoices, receipts and expenditure documentation submitted by Pennsylvania "service providers" to Real Alternatives, or its predecessor groups Morning Star Pregnancy Services and Morning Star Project WIN Advisory Council.

Request at 1, R.R. at 28a.[4] In November 2017, DHS issued a response denying the Request. DHS Response at 1-2, R.R. at 37a-38a. DHS stated it did not possess responsive records and communicated Real Alternatives' assertion that the requested records in Real Alternatives' possession were not accessible under RTKL Section 506(d)(1), as they did not directly relate to any governmental function performed by Real Alternatives under a contract with any Commonwealth Agency. *Id.* (citing 65 P.S. § 67.506(d)(1)).

Requester appealed DHS's denial to the OOR. Requester's Appeal at 1-2, R.R. at 44a-45a. Real Alternatives requested leave to participate and submit information in the appeal pursuant to Section 1101(c) of the RTKL, which the OOR granted. Real Alternatives' Letter, 12/14/17 at 1-2, R.R. at 52a (citing 65 P.S. § 67.1101(c)); OOR Final Determination at 2, R.R. at 179a. DHS and Real Alternatives submitted position statements to the OOR. Real Alternatives' Position Statement at 1-7, R.R. at 66a-72a; DHS's Position Statement at 1-6, R.R. at 161a-66a. DHS also submitted the sworn attestations of Andrea Bankes, Administrative

---

Bagatta Affidavit) at 4, ¶ 21, R.R. at 77a (emphasis added). Thus, "Program Development and Advancement Agreement" presumably refers to a program other than Pennsylvania's Alternatives to Abortion Services Program.

[4] Requester also sought additional information not at issue in the present appeal. References to the Request herein refer only to items 1 and 2.

4

Officer for DHS's Office of Administration (Bankes), and Karen Herrling, Director of DHS's Office of Social Programs (Herrling). Bankes Attestation at 1-2, R.R. at 168a-69a; Herrling Attestation at 1-3, R.R. at 70a-72a. Real Alternatives submitted the affidavit (First Bagatta Affidavit) of its president, Kevin I. Bagatta (Bagatta). *See* First Bagatta Affidavit at 1-5, R.R. at 74a-78a.

In January 2018, the OOR issued a final determination affirming DHS's denial of the Request. The OOR accepted the First Bagatta Affidavit as sufficient evidence to establish that the records sought did not directly relate to Real Alternatives' performance of a governmental function pursuant to the Grant Agreement with DHS. OOR Final Determination, 1/22/18 at 9-11, R.R. at 186a-88a. Requester appealed the OOR's determination to this Court.

We vacated the OOR's January 2018 final determination and remanded the matter to the OOR. We concluded that the First Bagatta Affidavit was insufficient to support the determination, because the affidavit merely stated the requested PDAAs were "completely unrelated to services provided by Real Alternatives under the Grant Agreement," without identifying services provided under the PDAAs that are not part of the program for which the DHS grant was provided. *Equity Forward v. Pa. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 225 C.D. 2018, filed May 17, 2019),[5] slip op. at 17 (quoting First Bagatta Affidavit at 4, ¶¶ 21 & 24-27, R.R. at 77a). Thus, we held that "the OOR had no basis to assess whether the conclusory statement that the PDAAs were unrelated to the governmental function was factually accurate." *Id.* Further, we noted that the First Bagatta Affidavit was insufficient to support a conclusion that the PDAAs were not directly

---

[5] We cite this unreported opinion as persuasive authority pursuant to this Court's Internal Operating Procedures. 210 Pa. Code § 69.414(a).

5

related to the governmental function identified in the Grant Agreement, because the imprecise and ambiguous references to "vendor service providers," "independent service providers," and "service providers" throughout the affidavit did not explain whether the service provider referred to in a given item of the affidavit was one that provided service under the Grant Agreement, the PDAAs, or both. *Id.* (citing First Bagatta Affidavit at 3-4, ¶¶ 16-18 & 21-23, R.R. at 76a-77a). We held, therefore, that the absence of sworn statements or testimony as to the scope, nature, and extent of Real Alternatives' and the service providers' contractual obligations under the PDAAs hindered meaningful appellate review. *Id.* at 17-18.

Regarding item 2 of the Request, we concluded that the OOR erred in confining its analysis to whether DHS had the Service Provider Monthly Invoices[6] in its possession and whether the Grant Agreement required Real Alternatives to submit these records to DHS. *Equity Forward*, slip op. at 19. We reasoned that "it would undermine the clear aim of RTKL Section 506(d)(1)—which recasts certain third-party records bearing the requisite connection to government as public records 'of the [government] agency' to require that [] the materials actually be 'of such agency' in the first instance." *Id.* at 19-20 (quoting *SWB Yankees LLC v. Wintermantel*, 45 A.3d 1029, 1044 (Pa. 2012)). Moreover, we observed that requiring the requested documents to be deliverable under the contract in question would also mean that private entities performing governmental functions could avoid disclosure of information relative to the performance of that governmental

---

[6] Bagatta attested that "Real Alternatives generates a monthly invoice for each service provider for services rendered that are reimbursable under the Grant Agreement (the Service Provider Monthly Invoice)," but that it "is not given to or received by [DHS]," as it "is not among the negotiated 'deliverables' required between Real Alternatives and [DHS] under the [2012] Grant Agreement." *Equity Forward*, slip op. at 6 (quoting First Bagatta Affidavit at 4-5, ¶¶ 29 & 32-33, Supplemental Reproduced Record at 74b-75b).

function simply by negotiating a contract that does not require disclosure, thus subverting the requirements of the RTKL. *Id.* at 20. We concluded, therefore, that the OOR erred when it failed to analyze whether there were documents responsive to item 2 which directly relate to the performance of the governmental function by Real Alternatives pursuant to the Grant Agreement. *Id.*

Accordingly, we directed the OOR on remand to evaluate whether the requested records directly related to Real Alternatives' performance of a governmental function under the Grant Agreement. *Equity Forward*, slip op. at 18 & 21. We further stated that if the OOR on remand deemed the Service Provider Monthly Invoices public records under RTKL Section 506(d)(1), 65 P.S. § 67.506(d)(1), it would then need to determine whether these documents constituted "invoices, receipts and expenditure documentation submitted by Pennsylvania 'service providers' to Real Alternatives," as described in the Request. *Id.* at 21.

On remand to the OOR, Real Alternatives supplemented the record with a copy of a PDAA for *in camera* review[7] and an additional affidavit from Bagatta (Second Bagatta Affidavit). OOR Final Determination, 6/26/20 at 3, R.R. at 245a; *see also* Second Bagatta Affidavit at 1, ¶ 2, R.R. at 235a. Bagatta attested, in relevant part:

> 7. Real Alternatives administered delivery of its services under the [] Grant Agreement through a network of twenty-eight[] independent[] vendor service providers[8]

---

[7] Requester sought *in camera* review of the PDAAs, and the OOR agreed to this request. *See* OOR E-mail, 11/5/19, R.R. at 241a.

[8] Bagatta addressed the concern expressed by this Court in its May 17, 2019 memorandum opinion regarding the imprecise and ambiguous references to "vendor service providers," "independent service providers" and "service providers" in the First Bagatta Affidavit, noting that the network of 28 independent "vendor service providers" with which Real Alternatives contracted

7

. . . who operated ninety facilities throughout the Commonwealth.

8. For the period covered by the Requests, Real Alternatives had an agreement directly with each [service p]rovider to provide services under the Program in a manner consistent with the terms of the [] Grant Agreement.

Second Bagatta Affidavit at 1, ¶¶ 7-8, R.R. at 235a (quoting Work Statement at 1, R.R. at 88a). Bagatta attested as follows regarding the PDAAs sought pursuant to item 1 of the Request:

9. For the period covered by the Request[], Real Alternatives had another, separate agreement with each [service p]rovider.

10. Under this separate agreement, called the Program Development and Advancement Agreement (PDAA), each [service p]rovider agreed to pay Real Alternatives, using money earned and owned by the [service p]rovider—*i.e.*, private money—to conduct activities completely outside of the [] Grant Agreement.

11. In general, these activities included development and advancement by Real Alternatives of pregnancy and support programs, both locally and nationally.

12. In essence, the PDAAs generated funds that Real Alternatives used to fund activities outside the scope of the [] Grant Agreement, *i.e.*, to fund activities and costs that would be rejected if they were charged to [DHS] under the [] Grant Agreement.

13. For instance, Real Alternatives used funds generated by the PDAAs in the following ways, among others:

---

shall be referred to throughout the Second Bagatta Affidavit as "the Providers, collectively; or[] the Provider, individually[.]" Second Bagatta Affidavit at 1, ¶ 7, R.R. at 235a. For the sake of consistency, "Providers," as defined in the Second Bagatta Affidavit, shall hereinafter be referred to as "service providers."

a. to make presentations about creating alternatives to abortion programs *in other states*;

b. to cover costs and staff time for new follow-on contract proposals and negotiations with [DHS] which are not chargeable costs subject to reimbursement under the [] Grant Agreement;

c. to establish cash reserves used by Real Alternatives to continue its operations, locally and nationally, while waiting for delayed government payments owed and due to Real Alternatives;

d. to cover costs incurred by Real Alternatives in advancing and protecting its life-affirming programming, which were also not chargeable costs under the [] Grant Agreement; and

e. the development and publication of sexual health education websites directed to teens and parents of teens.

14. Overall, the PDAAs essentially provided funding to Real Alternatives so that it could cover any cost for any activity it pursued in furtherance of advancing alternatives to abortion services, []which costs were *outside the scope of* the [] Grant Agreement.

15. To be clear, the PDAAs were voluntary agreements between Real Alternatives and each [service p]rovider and they were agreements that were totally unrelated to the governmental function that Real Alternatives performed under the [] Grant Agreement.

16. [DHS] was not a party to the PDAAs, did not approve or disapprove the PDAAs, and was, for all purposes, a stranger to the PDAAs.

17. The PDAAs existed so that Real Alternatives could remain scrupulous and in strict compliance with the [] Grant Agreement, but still cover costs it incurred in pursuit of the *private* interest of championing the shared belief of Real Alternatives and the [service p]roviders that alternatives to abortion programs are good and valuable services to women, both in Pennsylvania and nationwide.

9

Second Bagatta Affidavit at 2-3, ¶¶ 9-17, R.R. at 236a-37a. Bagatta further attested regarding the Service Provider Monthly Invoices identified as responsive to item 2 of the Request:

18. Under the [] Grant Agreement, specially-trained persons at the [service p]roviders entered information into a Real Alternatives trade secret, copyrighted, proprietary software system concerning services provided to clients related to the Program.

19. With that proprietary software, Real Alternatives generated a monthly invoice for each service provider for services rendered that were reimbursable under the Grant Agreement (the Service Provider Monthly Invoice).

20. The Service Provider Monthly Invoice contains confidential identification numbers, which are used to identify the client receiving services (*i.e.*, the woman receiving counseling) as well as the location at which she received services.

21. Other information on the Service Provider Monthly Invoice includes the amount of counseling time provided per client, classes attended, services provided, and the total reimbursable amount due the service providers.

22. The Service Provider Monthly Invoice was not given to or received by [DHS] under the [] Grant Agreement.

23. The totals from every Service Provider Monthly Invoice were added together each month, and then submitted by Real Alternatives to [DHS], along with a host of other reimbursable charges, on a report known as the "Monthly Expenditure Report" for approval. The aggregate Service Provider Monthly Invoice total is included in the "Counseling Reimbursement" and "Pregnancy Test Kits" cost category lines of the "Monthly Expenditure Report."

24. Under the [] Grant Agreement, Real Alternatives pays service providers with funds received quarterly from [DHS].

10

25. In effect, the Service Provider Monthly Invoices were but a single cost of Real Alternatives['] cost category, among a fleet of many other costs included in a fleet of costs categories (including Salary and Wages, Payroll Taxes, Professional Development and Training, Workers['] Compensation Insurance, 403B Contribution, Employee Group Insurance, Consulting, Postage/ Shipping, Auditing, Travel/Lodging, Rent, Telephone Service, General Business Liability Insurance, Directors and Owners Liability Insurance, Office Expense, Computer Upgrades, Equipment Services Contracts, Information and Training Materials, Services Advertising, Services Travel, Services Database Consulting & Development, Meeting and Seminars, Toll-free Referral System). These cost categories were submitted by Real Alternatives to [DHS] for approval to ensure they were within the contract-approved budget of cost categories.

Second Bagatta Affidavit at 3, ¶¶ 18-25, R.R. at 237a.

Real Alternatives also submitted a position statement, contending that the Second Bagatta Affidavit showed the PDAAs were entirely unrelated to its performance of a governmental function pursuant to the [] Grant Agreement. *See* Remand Position Statement, 10/25/19 at 1-2, R.R. at 230a-31a. Real Alternatives also asserted that disclosure of the PDAAs would infringe upon due process, privacy and property protection rights guaranteed by Article I, Section 1 of the Pennsylvania Constitution. Remand Position Statement, 10/25/19 at 2, R.R. at 231a (citing Pa. Const. art. I, §1). Further, Real Alternatives argued that the Service Provider Monthly Invoices responsive to item 2 of the Request constituted "mere cost information" and, thus, were not accessible as records directly relating to its performance of a governmental function pursuant to RTKL Section 506(d)(1). *Id.* at 3, R.R. at 232a (quoting *UnitedHealthcare of Pa., Inc. v. Baron*, 171 A.3d 943, 964 (Pa. Cmwlth. 2017)).

On June 26, 2020, the OOR issued a final determination granting in part and denying in part Requester's appeal on remand. OOR Final Determination, 6/26/20 at 8, R.R. at 250a. The OOR concluded that the PDAAs sought pursuant to item 1 of the Request were not accessible because they did not directly relate to Real Alternatives' performance of a governmental function pursuant to the [] Grant Agreement. *Id.* at 4, R.R. at 246a. The OOR determined Bagatta's affidavit demonstrated that the PDAAs constitute "separate agreements between [Real Alternatives] and the [s]ervice [p]roviders in which [Real Alternatives] is obligated to provide services *to the [s]ervice [p]roviders* for which the [s]ervice [p]roviders compensate [Real Alternatives]." *Id.* at 3-4, R.R. at 245a-46a (emphasis in original). Further, the OOR concluded "[t]he PDAAs do not evidence any contract in which the [s]ervice [p]roviders are providing any services [to Real Alternatives] in support of [Real Alternatives'] performance of its contract with [DHS]." *Id.* at 4, R.R. at 246a. The OOR asserted that regardless of "any similarity [between] the services provided under [the PDAAs and the Grant Agreement]," Real Alternatives is "performing a service for a non-governmental entity, as opposed to the service providers providing services to [Real Alternatives] in furtherance of [Real Alternatives'] agreement with [DHS]." *Id.* at 4 n.3, R.R. at 246a. Thus, the OOR reasoned that "Section 506(d)(1) of the RTKL cannot be read for the proposition that a contract between private entities is subject to public disclosure because the services provided are similar to services provided to a government agency." *Id.* at 4 n.3, R.R. at 246a.

In regard to item 2 of the Request, however, the OOR concluded that the Service Provider Monthly Invoices were subject to access as records directly related to Real Alternatives' performance of a governmental function pursuant to the

12

Grant Agreement. *Id.* at 5-6, R.R. at 247a-48a. The OOR determined that the requested invoices "include[d] information beyond mere financial information, *i.e.*, service provider reimbursement amounts," as they contained "additional information specifically describing the services provided by the service providers in furtherance of [Real Alternatives'] agreement with [DHS]." *Id.* at 5, R.R. at 247a. The OOR reasoned that "[i]t is difficult to imagine information more relevant to the performance of a governmental function tha[n] information describing the services performed pursuant to that governmental function." *Id.* Further, the OOR determined that Real Alternatives' reliance on *UnitedHealthcare* and *Buehl v. Office of Open Records*, 6 A.3d 27 (Pa. Cmwlth. 2010), was misplaced, as "those cases involved a request for the amount of payments made by a government contractor to subcontractors for services at prices *separately negotiated* from the prices negotiated between the government and its prime contractor," whereas, here, "subcontractors are reimbursed by the government for the cost of services provided."[9] *Id.* at 6-7, R.R. at 248a-89a (citing *UnitedHealthcare*; *Buehl*). The OOR observed that "the amount[] paid to the subcontractors for services provided [is] the same amount[] paid by the government," even though "the amount of funds reimbursed to subcontractors is disclosed to [DHS] in the aggregate," rather than "by individual subcontractor." *Id.* Thus, the OOR determined that "the reimbursement information

_____

[9] In *UnitedHealthcare*, we considered whether disclosure of requested nursing home provider rates was required under RTKL Section 506(d)(1) and noted that it was "clear" from the record "that knowledge of the [r]equested [r]ates was not necessary for DHS to assure compliance with the [government] contract," yet remanded the matter to the OOR to "analyze how the amount of the [nursing home provider r]ates directly relate[d] to the [government contractors] performing their governmental function under the [] contract[.]" *UnitedHealthcare*, 171 A.3d at 964. In *Buehl*, wholesale prices paid by a contractor for goods resold to the Department of Corrections were not subject to disclosure under Section 506(d)(1) the RTKL. *See Buehl*, 6 A.3d at 31. We note that Real Alternatives did not cite *Buehl* in its remand position statement. *See* Remand Position Statement, 10/25/19 at 1-4, R.R. at 230a-33a.

13

contained within the Service Provider Monthly Invoices [is] not the type of information permitted to be withheld under *UnitedHealthcare* and *Buehl*." *Id.* Nevertheless, the OOR concluded that the names of individuals receiving counseling services are protected pursuant to the constitutional right to privacy and, therefore, require redaction. *Id.* at 7-9, R.R. at 249a-51a.

Real Alternatives filed a petition for reconsideration, asserting that although the Service Provider Monthly Invoices do not divulge the names of persons receiving services, they nonetheless reference such persons by means of confidential identification numbers which require redaction under RTKL Section 708(b)(5), 65 P.S. § 67.708(b)(5). Real Alternatives' Petition for Reconsideration and Request for Remand at 1-2, ¶¶ 3-5, R.R. at 253a-54a (citing First Bagatta Affidavit at 4-5, ¶¶ 30-31, R.R. at 77a-78a).

On September 11, 2020, the OOR issued a revised final determination directing DHS to redact the confidential identification numbers from the Service Provider Monthly Invoices prior to disclosure. OOR Final Determination, 9/11/20 at 9, R.R. at 306a. The OOR concluded that individual identification numbers constitute "personal identification information" excepted from disclosure pursuant to RTKL Section 708(b)(6), 65 P.S. § 67.708(b)(6), and protected by the constitutional right to privacy. *Id.* at 8, R.R. at 305a (citing *Crew v. Pa. Dep't of Corr.* (Pa. Cmwlth., No. 1006 C.D. 2010, filed Nov. 19, 2010), slip op. at 2). However, the OOR concluded that Real Alternatives' request for redaction of other information, such as counseling time provided, classes attended, and services provided, exceeded the scope of this Court's remand order and, thus, could not be considered. OOR Final Determination, 9/11/20 at 9 n.4, R.R. at 306a (citing *Levy v. Senate of Pa.*, 94 A.3d 436, 442 (Pa. Cmwlth. 2014)). Nonetheless, the OOR noted

14

that medical information contained within non-medical records could be subject to disclosure if the records did not identify the individual connected with the medical information. *Id.* (citing *Dep't of Corr. v. St. Hilaire*, 128 A.3d 859 (Pa. Cmwlth. 2015)).[10]

Requester again petitioned for review in this Court.[11]

## II. Discussion

The RTKL "is remedial legislation designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions[.]" *Bowling v. Off. of Open Recs.*, 990 A.2d 813, 824 (Pa. Cmwlth. 2010), *aff'd*, 75 A.3d 453 (Pa. 2013). In 2009, the General Assembly replaced the former Right-to-Know Act[12] with the current RTKL, thereby significantly expanding public access to

---

[10] In its petition for reconsideration of the OOR's June 26, 2020 final determination, Real Alternatives requested that the OOR conduct *in camera* review of "an exemplar Service Provider Monthly Invoice" before issuing a revised final determination. Petition for Reconsideration at 5, ¶ 27, R.R. at 257a. The OOR denied Real Alternatives' request, stating that Real Alternatives' comprehensive description of the contents of the Service Provider Monthly Invoices rendered *in camera* review unnecessary. OOR Final Determination, 9/11/20 at 5 n.9, R.R. at 306a.

[11] "This Court's standard of review of a final determination of the OOR is *de novo* and our scope of review is plenary." *Hunsicker v. Pa. State Police*, 93 A.3d 911, 913 n.7 (Pa. Cmwlth. 2014). "As to factual disputes, this Court may exercise functions of a fact-finder, and has the discretion to rely upon the record created below or to create its own." *Dep't of Lab. & Indus. v. Heltzel*, 90 A.3d 823, 828 (Pa. Cmwlth. 2014) *(en banc)* (citing *Bowling v. Off. of Open Recs.*, 75 A.3d 453 (Pa. 2013)). "A court reviewing an appeal from an OOR [appeals] officer is entitled to the broadest scope of review, a review of the entire record on appeal along with other material, such as a stipulation of the parties, or an *in camera* review of the documents at issue, and we may further supplement the record through hearing or remand." *Pa. Dep't of Lab. & Indus. v. Darlington*, 234 A.3d 865, 871 n.6 (Pa. Cmwlth. 2020) (citation omitted).

[12] Act of June 21, 1957, P.L. 390, *as amended*, 65 P.S. §§ 66.1–66.4

15

governmental records in order to promote government transparency. *Levy v. Senate of Pa.*, 65 A.3d 361, 368 (Pa. 2013).  Section 506(d)(1) of the RTKL provides:

> A public record that is not in the possession of an agency but is in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the agency, and which directly relates to the governmental function and is not exempt under this act, shall be considered a public record of the agency for purposes of this act.

65 P.S. § 67.506(d)(1).  Thus, the RTKL preserves "some level of public access to information about governmental functions . . . where an agency chooses to contract out the performance of that function to a third[ ]party." *UnitedHealthcare*, 171 A.3d at 963 (citation omitted).  This Court has clarified that "Section 506(d)(1) does not reach all records in possession of a private contractor that relate to the governmental function; rather, the records reached are only those that relate to *performance* of that function." *Allegheny Cnty. Dep't of Admin. Servs. v. Parsons*, 61 A.3d 336, 346 (Pa. Cmwlth. 2013); *see UnitedHealthcare*, 171 A.3d at 963 (citing *Parsons*); *Dental Benefit Providers, Inc. v. Eiseman*, 86 A.3d 932, 939 (Pa. Cmwlth. 2014), *aff'd*, 124 A.3d 1214 (Pa. 2015) (holding that non-exempt records of a third party contracting with a governmental agency are subject to disclosure only if the information directly relates to the performance of a governmental function). "This finely drawn distinction is critical to properly analyzing and applying [Section 506(d)(1)]." *Parsons*, 61 A.3d at 346.

Generally, an agency bears the burden of proving a record is exempt from disclosure. *Parsons*, 61 A.3d at 342.  In that regard, "[t]hird-party contractors in possession of requested records are placed in the shoes of . . . [the] agency for purposes of the burden of proof when the contractor performs a governmental

16

function on behalf of the agency[] and those records directly relate to the contractor's performance of that function." *Parsons*, 61 A.3d at 342 (citing *SWB Yankees*, 45 A.3d 1029) (noting that RTKL Section 506(d)(1) "recasts certain third-party records bearing the requisite connection to government as public records 'of the government agency'") (brackets omitted).

## A. PDAAs

On appeal, Requester argues the OOR erred in determining that the PDAAs requested pursuant to item 1 of the Request are not accessible under Section 506(d)(1) of the RTKL. *See* Requester's Br. at 14-15 (citing 65 P.S. § 67.506(d)(1)). Requester contends Real Alternatives' performance of services to private service providers relates directly to Real Alternatives' performance of a governmental function on behalf of DHS. *See id.* at 15. Requester also asserts that whether DHS is a party to the PDAAs is not determinative of whether those agreements are accessible under the RTKL. *See id.* at 17. Further, Requester maintains that the Second Bagatta Affidavit failed to comply with this Court's directive on remand to identify services provided pursuant to the PDAAs that were distinguishable from the performance of services in furtherance of the Grant Agreement. *See id.* at 15-18. Thus, Requester contends that Real Alternatives has "failed to meet its burden of proof to establish that the PDAAs are not public[.]" *Id.* at 11.

Real Alternatives counters that, in response to this Court's instructions on remand, it proffered an additional affidavit "specifically enumerating services provided under the PDAAs that were not part of, and *could not be part of*, the Program described in the [] Grant Agreement[.]" Real Alternatives' Br. at 20. For instance, Real Alternatives cites Bagatta's attestation as to the use of funds generated

17

by the PDAAs to make presentations regarding the creation of programs promoting alternatives to abortion in other states, to subsidize its operations both locally and nationally, to cover expenses incurred advancing "life-affirming programming" that were not "chargeable costs" under the Grant Agreement, and to develop sexual health education websites. *Id.* at 21 (citing Second Bagatta Affidavit at 2, ¶ 31, R.R. at 236a). Maintaining that these services "were paid with private money paid by the [s]ervice [p]roviders," Real Alternatives insists that Bagatta "made plain, in effect, that it was an agreement among private parties to ensure that a mutually shared interest was advanced both in Pennsylvania and elsewhere" and that the PDAAs constitute "quintessential[ly] private agreement[s] among private parties for benevolent purposes." *Id.* at 21-22. Further, Real Alternatives contends that the Second Bagatta Affidavit "was [] buttressed on remand by the [a]ppeals [o]fficer's *in camera* review of a PDAA." *Id.* at 22. Real Alternatives asserts that proffering the sample copy of a PDAA for *in camera* review by the OOR satisfied its "limited burden . . . to demonstrate that the requested records were private records that were not part of the Program and the [2012] Grant Agreement." *Id.* (citing *Off. of Governor v. Davis*, 122 A.3d 1185, 1194 (Pa. Cmwlth. 2015) (citation omitted) (holding that "records reviewed *in camera* are sufficient evidence for an agency to meet its burden of proof"); *Parsons*, 61 A.3d at 342 (citing RTKL Section 305, 65 P.S. § 67.305)[13] (stating that "[t]he presumption of public nature shared by records in possession of a local agency does not apply to records that are in possession of a third party")).

---

[13] "A record in the possession of a Commonwealth agency or local agency shall be presumed to be a public record." RTKL Section 305(a), 65 P.S. § 67.305(a).

As summarized above, the OOR determined that the PDAAs did not relate directly to Real Alternatives' performance of a governmental function pursuant to the Grant Agreement and, thus, were not publicly disclosable under RTKL Section 506(d)(1), 65 P.S. § 67.506(d)(1). *See* OOR Final Determination, 9/11/20 at 4, R.R. at 301a. Acknowledging overlap between certain types of services performed pursuant to both the PDAAs and the Grant Agreement, the OOR nevertheless concluded the PDAAs did not bear the requisite connection under RTKL Section 506(d)(1), because those agreements obligated Real Alternatives "to provide services *to the [s]ervice [p]roviders* for which the [s]ervice [p]roviders compensate[d] [Real Alternatives], . . . as opposed to the service providers providing services to [Real Alternatives] in furtherance of [Real Alternatives'] agreement with [DHS]." *Id.* at 3-4, R.R. at 300a-01a; *Id.* at 4 n.3, R.R. at 300a. We agree with this reasoning.

We acknowledge that the PDAAs provide for a funding scheme which appears to calculate payments due to Real Alternatives as withholding of a percentage of Grant Agreement funds paid by Real Alternatives to service providers. *See* PDAA Sample Copy, Supplemental Record. We recognize that such a link between the payments made under the PDAAs and those made under the Grant Agreement could give rise to questions concerning the *de facto* separateness of the PDAAs. However, the reference to the Grant Agreement rates in the sample PDAA relates solely to the calculation of payments for services provided by Real Alternatives *to* service providers, not to the scope of the Grant Agreement or to any services to be provided *by* the service providers under the Grant Agreement. The sources and propriety of the providers' payments to Real Alternatives are not before us. We express no opinion on such issues, which are more properly the subject of

19

audits as provided in Section 403 of The Fiscal Code, Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. § 403, the results of which may be publicly accessible under the RTKL. *See Dep't of Pub. Welfare v. Chawaga*, 91 A.3d 257, 258 (Pa. Cmwlth. 2014) (stating that a performance audit analyzing a government contractor's compliance with two Department of Public Welfare contracts was accessible under the RTKL in the absence of a demonstrated exemption; the performance audit report was "created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency" and was therefore a "record" under Section 102 of the RTKL, 65 P.S. § 67.102).

The PDAA reviewed *in camera* by the OOR and, subsequently, by this Court is a one-page document that merely contains an indefinite, open-ended statement outlining the general purpose for which Real Alternatives shall use PDAA-generated funds. *See* PDAA Sample Copy, Supplemental Record. As noted above, the First Bagatta Affidavit attests that Real Alternatives and service providers entered into the PDAAs to "develop and advance *other* life affirming programs both locally and nationally." First Bagatta Affidavit at 4, ¶ 21, R.R. at 77a (emphasis added). The Second Bagatta Affidavit, quoted above, is consistent with that statement but provides a more detailed attestation that the PDAAs are separate agreements specifically created to address programs *other than* Pennsylvania's Alternatives to Abortion Services Program, which is the subject of the Grant Agreement.[14] *See* Second Bagatta Affidavit at 2-3, ¶¶ 9-17, R.R. at 236a-37a. We

---

[14] Bagatta attested that the PDAAs generated fees which subsidized only activities which fell "completely outside of the [] Grant Agreement." Second Bagatta Affidavit at 2, ¶ 10, R.R. at 237a. Nevertheless, we note that the Second Bagatta Affidavit indicates that Real Alternatives has utilized funds generated by the PDAAs to subsidize both activities which overlap with and those which exceed the scope of the Grant Agreement. *See* Second Bagatta Affidavit at 2-3, R.R. at 236a-37a. However, the non-responsiveness of a portion of a record may not serve as a basis for

20

agree with the OOR that the PDAAs, together with the First and Second Bagatta Affidavits, sufficiently establish that the PDAAs are agreements relating to services separate from those which are subject to and reimbursable under the Grant Agreement.

Further, this Court has previously determined that financial information concerning payments made under a government contract does not, standing alone, constitute information pertaining to performance of a government function. In *UnitedHealthcare*, the requester sought disclosure of rates paid by DHS to managed care organizations participating in a medical assistance program. *UnitedHealthcare*, 171 A.3d at 946. We explained that the purpose of allowing access only to records directly related to performance of a governmental function was to "prevent[] access to records that may relate to the contract but do not relate to its performance." *Id.* at 963. Thus, the pertinent issue was "whether the information sought had a direct bearing on the third-party contractor's obligations" under its contract with the agency. *Id.* at 964. We reasoned that the rates requested in *Baron* did not relate directly to performance of the government contract under RTKL Section 506(d)(1), 65 P.S. § 67.506(d)(1), because knowledge of those rates was not necessary for DHS to assure compliance with the contract and there was no indication that DHS used the rate information to monitor compliance with or otherwise oversee the contract; rather, DHS administered the medical assistance program without that information. 171 A.3d at 964.

Likewise, here, there is no indication that the rates charged by Real Alternatives for services it performs for others under the PDAAs have any direct

---

redacting that portion or for withholding the entire record. *See Haverstick v. Pa. State Police* (Pa. Cmwlth., No. 1042 C.D. 2020, filed Apr. 12, 2022), slip op. at 11 (citing and discussing *Smart Commc'ns Holding, Inc. v. Wishnefsky*, 240 A.3d 1014 (Pa. Cmwlth. 2020)).

bearing on Real Alternatives' obligations to DHS under the Grant Agreement. For example, by analogy to the analysis in *UnitedHealthcare*, there is no suggestion here that DHS has knowledge of the rates paid *from* service providers *to* Real Alternatives under the separate PDAAs or that such knowledge of rates paid under separate contracts is necessary for DHS to oversee or monitor compliance with the Grant Agreement. Without any evidence of a direct relationship between the PDAAs and Real Alternatives' performance of its contractual obligations to DHS under the Grant Agreement, we cannot find that there is anything in the one-page PDAA form agreement that relates to the performance of a governmental function.

For these reasons, and consistent with our precedent in *UnitedHealthcare*, we conclude that the rate information in the PDAAs does not relate directly to the performance of a governmental function. Therefore, we affirm the OOR's September 11, 2020 final determination with respect to the PDAAs sought pursuant to item 1 of the Request.

## B. Service Provider Monthly Invoices

"Section 506(d)(1) does not reach all records in possession of a private contractor that relate to the governmental function; rather, the records reached are only those that relate to *performance* of that function." *Parsons*, 61 A.3d at 346 (original emphasis partially deleted). Real Alternatives challenges the OOR's determination that redacted copies of the Service Provider Monthly Invoices are accessible under RTKL Section 506(d)(1). Real Alternatives' Br. at 27. Real Alternatives asserts that the OOR erred in distinguishing *UnitedHealthcare* and *Buehl*. *Id.* at 28-29. Real Alternatives contends that as in those cases, the invoices here constitute "mere cost information" that is not disclosable under the RTKL, as

22

it is not used by DHS to monitor compliance with the Grant Agreement or for purposes of oversight. *See id.* at 28 (citing *UnitedHealthcare*, 171 A.3d at 964; *Buehl*, 6 A.3d at 31). Real Alternatives maintains that DHS monitors compliance with the Grant Agreement by reviewing monthly expenditure reports, which contain information from Service Provider Monthly Invoices in aggregate form, and that this aggregated information "compose[s] just [one] part of dozens of budget line expenses submitted to DHS for a suite of services provided by Real Alternatives under the Program." *Id.* at 29-30. Thus, Real Alternatives contends that the requested Service Provider Monthly Invoices do not directly relate to performance of a governmental function, but rather, constitute mere cost information that DHS does not utilize to monitor compliance with the Grant Agreement. *See id.* at 30 (citing Herrling Attestation at 2, ¶ 12, R.R. at 171a). We reject this argument and agree with the OOR that the Service Provider Monthly Invoices are accessible under RTKL Section 506(d)(1), 65 P.S. § 67.506(d)(1), subject to the redaction of confidential identification numbers.[15]

On remand to the OOR, Bagatta attested that in addition to containing the amount owed to service providers for the provision of services reimbursable under the Grant Agreement, each Service Provider Monthly Invoice additionally identifies the locations at which clients received services, the amount of counseling time provided per client, classes attended by clients and the services provided to clients. Second Bagatta Affidavit at 3, ¶¶ 19, 20-21, R.R. at 237a. Based on this evidence, the OOR determined that the requested invoices "include[d] information beyond mere financial information," as they contained "additional information specifically describing the services provided by the service providers in furtherance

---

[15] Neither party requests *in camera* review of the Service Provider Monthly Invoices.

of [Real Alternatives'] agreement with [DHS]." OOR Final Determination, 6/26/20 at 5, R.R. at 247a. As the OOR aptly observed, "[i]t is difficult to imagine information more relevant to the performance of a governmental function tha[n] information describing the services performed pursuant to that governmental function." OOR Final Determination, 6/26/20 at 5, R.R. at 247a.

The Service Provider Monthly Invoices contain descriptions of services performed by service providers in furtherance of the Grant Agreement, which are reimbursable under that agreement. Therefore, the Service Provider Monthly Invoices "have a direct relationship to [Real Alternatives'] contractual obligations" and are disclosable under RTKL Section 506(d)(1), 65 P.S. § 67.506(d)(1).

Finally, Real Alternatives asserts that, even if deemed publicly accessible, the Service Provider Monthly Invoices are nevertheless subject to further redaction. Real Alternatives' Br. at 31. Specifically, Real Alternatives contends that the Service Provider Monthly Invoices should be redacted to omit the amount of counseling time provided per client, classes attended, services provided, and the total reimbursable amount due, as this information constitutes a "record of an individual's medical, psychiatric or psychological history or disability status, including an evaluation, consultation, prescription, diagnosis or treatment or related information that would disclose individually identifiable health information" pursuant to RTKL Section 708(b)(5). *Id.* at 35-36 (quoting 65 P.S. § 67.708(b)(5)). We disagree.

In *St. Hilaire*, a reporter filed an RTKL request with the Department of Corrections seeking all records documenting inmate injuries and deaths as well as employee injuries and deaths during a certain timeframe. *See St. Hilaire*, 128 A.3d at 860. We held that the requested records were not exempt from disclosure under

the medical records exemption contained in RTKL Section 708(b)(5),[16] reasoning that the "[r]equestor only sought *non-identifiable* injury information; she did not seek medical records, the identity of inmates, or any other *identifiable* health information. . . . [T]o the extent that the reports do contain such information, *they can be redacted/de-identified* in accordance with [S]ection 706 of the RTKL."[17] *St. Hilaire*, 128 A.3d at 866 (emphasis added). Thus, we agree with the OOR that the Service Provider Monthly Invoices are disclosable and do not require redaction

_____

[16] RTKL Section 708(b)(5) exempts the following from access under the RTKL:

> A record of an *individual's* medical, psychiatric or psychological history or disability status, including an evaluation, consultation, prescription, diagnosis or treatment; results of tests, including drug tests; enrollment in a health care program or program designed for participation by persons with disabilities, including vocation rehabilitation, workers' compensation and unemployment compensation; *or related information that would disclose individually identifiable health information*.

65 P.S. § 67.708(b)(5) (emphasis added).

[17] RTKL Section 706 provides, in relevant part:

> If an agency determines that a public record, legislative record or financial record contains information which is subject to access as well as information which is not subject to access, the agency's response shall grant access to the information which is subject to access and deny access to the information which is not subject to access. If the information which is not subject to access is an integral part of the public record, legislative record or financial record and cannot be separated, the agency shall redact from the record the information which is not subject to access, and the response shall grant access to the information which is subject to access. The agency may not deny access to the record if the information which is not subject to access is able to be redacted.

65 P.S. § 67.706.

25

beyond the omission of individually identifiable health information—*i.e.*, clients' confidential identification numbers. *See id.*[18]

### III. Conclusion

For the reasons discussed above, we affirm the OOR's final determination.

_____
CHRISTINE FIZZANO CANNON, Judge

President Judge Cohn Jubelirer and Judge Wallace did not participate in the decision of this case.

---

[18] As recounted above, we instructed the OOR on remand to determine whether the Service Provider Monthly Invoices constitute "invoices, receipts and expenditure documentation submitted by Pennsylvania 'service providers' to Real Alternatives, as requested," in the event that the OOR deemed the Service Provider Monthly Invoices public records under the RTKL. *See Equity Forward*, slip op. at 21 (quotation marks omitted). Although the OOR did not expressly discuss this question, its conclusion that the Service Provider Monthly Invoices are accessible under the RTKL indicates that the OOR considers these records responsive to item 2 of the Request. *See* OOR Final Determination, 9/11/20 at 5-10, R.R. at 302a-07a. Neither party disputes the responsiveness of the Service Provider Monthly Invoices to the Request.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Real Alternatives, | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Department of Human Services | : | |
| and Equity Forward (Office of | : | |
| Open Records), | : | No. 986 C.D. 2020 |
| Respondents | : | |
| | : | |
| | : | |
| Equity Forward and Mary Alice Carter, | : | |
| Petitioners | : | |
| | : | |
| v. | : | |
| | : | |
| Pennsylvania Department of Human | : | |
| Services (Office of Open Records), | : | No. 1002 C.D. 2020 |
| Respondent | : | |

## O R D E R

AND NOW, this 19th day of July, 2022, the September 11, 2020 final determination of the Office of Open Records is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Real Alternatives,                                      :
                              Petitioner               :
                                                       :
           v.                                          : No. 986 C.D. 2020
                                                       :
Department of Human Services and                       :
Equity Forward (Office of Open Records),               :
                              Respondents              :
                                                       :
Equity Forward and Mary Alice Carter,                  :
                              Petitioners              :
                                                       :
           v.                                          : No. 1002 C.D. 2020
                                                       : ARGUED:  March 7, 2022
Pennsylvania Department of Human                       :
Services (Office of Open Records),                     :
                              Respondent               :


BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**DISSENTING OPINION BY**
**SENIOR JUDGE LEADBETTER**                    **FILED:  July 19, 2022**


I join the Majority's result and analysis concerning the Service Provider Monthly Invoices but must respectfully dissent regarding the Program Development and Advancement Agreements (PDAAs).  I believe that the nature of those contracts between Real Alternatives and the Service Providers is so inextricably bound with Real Alternatives' performance of its contract with the Pennsylvania Department of Human Services (DHS) that they directly relate thereto.  Examination of the sample PDAA provided *in camera* (all of the PDAAs, we are told, have identical terms)

shows that, contrary to the Bagatta Affidavit, the money "paid" by the Service Providers to Real Alternatives is not private money earned and owned by the Service Providers.[1] Rather, under the terms of the PDAAs, Real Alternatives withholds a fixed percentage of the money invoiced by and due the Service Providers and keeps it to underwrite other activities for which DHS will not pay. In other words, it is a scheme to get DHS to unknowingly pay Real Alternatives for non-government activities, and it uses the PDAAs as the vehicle to that end.

Thus, I believe that the PDAAs directly relate to the performance of Real Alternatives' government function. Real Alternatives does no counselling itself; that function is ceded to the Service Providers. The government function which DHS delegates to Real Alternatives is to recruit Service Providers and be the conduit through which DHS pays them certain amounts for specific services. The PDAAs amend that agreement such that DHS is also in fact paying Real Alternatives to do different things for which DHS has not contracted. Thus, the PDAAs directly relate to Real Alternatives' performance of its government function because they change the scope and extent of the functions it contracted with DHS to perform.

Finally, one overarching purpose of the Right-to-Know Law (RTKL)[2] is to make transparent the way in which government funds are being spent. It is, "remedial legislation to facilitate government transparency and promote accountability." *McKelvey v. Pa. Dep't of Health*, 255 A.3d 385, 399 (Pa. 2021). A device which re-routes government money through a "private" contract in order to shield it from public scrutiny subverts that purpose. Therefore, disclosure is appropriate not only under the terms of the RTKL but serves its underlying purpose

---

[1] (Second Bagatta Aff. at 2, ¶10; Reproduced Record at 236a.)

[2] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

BBL - 2

as well. For all the foregoing reasons, I would reverse the decision of the OOR, and require disclosure of the PDAAs.

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita